# IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF NEW MEXICO

JUDY BAILEY, guardian *ad litem* and next
friend for M.W. and V.W., minors,

      Plaintiffs,

     vs.                                                                   No. CIV 96-959 LH/DJS

HARRY PACHECO, in his personal capacity
acting under color of state law, RAOUL
GONZALES, in his personal capacity acting
under color of state law, SHARON
MULLEN, in her personal capacity acting
under color of state law, BRENDA
SANDBERG, in her personal capacity acting
under color of state law, SUSAN ELAM,
in her personal capacity acting under color of
state law, MAUREEN GRINDELL, in her
personal capacity acting under color of state
law, EFFIE OSBORNE, in her personal
capacity acting under color of state law,
JOHN KALEJTA, in his personal capacity
acting under color of state law, NORA
BUCHANAN, in her personal capacity acting
under color of state law, SANTIAGO
OLIVAS and ROCHELLE OLIVAS, in their
personal capacities acting under color of state
law,

     Defendants.

## MEMORANDUM OPINION AND ORDER

**THIS MATTER** comes before the Court on Defendants Elam and Sandberg's Motion to

Dismiss Count II of the Complaint (Docket No. 38), filed February 13, 1997; Defendant Santiago

Olivas's Motion to Dismiss Count II of the Complaint (Docket No. 58), filed March 12, 1997;

Defendant Santiago Olivas's Motion to Dismiss (Docket No. 81), filed May 20, 1997; Defendant Rochelle Olivas's Motion to Dismiss (Docket No. 44), filed February 20, 1997; Defendants Osborne, Grindell, Mullen, and Gonzales's Motion to Dismiss on the Basis of Qualified Immunity as joined by Defendants Sandberg and Elam (Docket No. 49), filed February 28, 1997; Defendants Kalejta and Buchanon's Motion to Dismiss on the Basis of Qualified Immunity (Docket No. 53), filed February 28, 1997; and Defendant Harry Pacheco's Motion for Summary Judgment (Docket No. 34), filed February 13, 1997. The Court, having considered the pleadings submitted by the parties, the arguments of counsel, and otherwise being fully advised, finds that the motions to dismiss Count II are not well taken and will be **denied**, the Olivas motions to dismiss are not well taken and will be **denied**, Defendants Osborne, Grindell, Mullen, and Gonzales' Motion to Dismiss on the Basis of Qualified Immunity as joined by Defendants Sandberg and Elam, is well taken in part and will be **granted in part**, Defendants Kalejta and Buchanon's Motion to Dismiss on the Basis of Qualified Immunity is not well taken and will be **denied**, and Defendant Pacheco's  Motion for Summary Judgment on the Basis of Qualified Immunity is not well taken and will be **denied**.

## BACKGROUND

This case was filed by Plaintiff on behalf of two minors, M.W. and V.W., after they allegedly suffered serious physical and emotional injuries while in foster care.  The minors were removed from the custody of their natural mother after she left them with a relative and did not return.  The state assumed legal custody of the children and they were placed in the physical custody of Defendants Rochelle and Santiago Olivas.  Plaintiff alleges that the Olivases sexually, physically, and emotionally abused the children and that the remaining defendants knew of and failed to act to end this abuse. Plaintiff accepted an Offer of Judgment by Defendants on behalf of V.W. and the Court entered Final

Judgment as to V.W. on July 24, 1997.   As Final Judgment has been entered as to V.W., those portions of the instant motions that address claims made by V.W. are moot and will be denied as such.

## MOTIONS TO DISMISS COUNT II

Defendants Elam and Sandberg seek to have Count II dismissed.   Defendant Santiago Olivas filed a separate motion to dismiss Count II on similar grounds.   The Court will address these two nearly identical motions simultaneously.   Defendants seek to have Count II dismissed arguing that its allegation that the Defendants interfered with M.W.'s associational rights with her sister fails to state a claim.   Plaintiff alleges that M.W. has a fundamental interest protected by the First and Fourteenth Amendment to the United States Constitution "to continue, maintain and develop an intimate familial relationship" with her biological sister V.W.  (Compl. ¶ 49.) Plaintiff further alleges that M.W. has a fundamental right to not be "intentionally separated from [V.W.] and knowingly placed in separate foster homes by the State of New Mexico . . . [acting] through the Defendants." (*Id.* ¶ 50.)  Finally, the Plaintiff alleges that the Defendants "intentionally interfered with [M.W. and V.W.'s] familial relationship with knowledge that their actions would adversely affect [M.W.'s] relationship [with her sister], and substantially departed from accepted professional judgment, practice or standards so as to abdicate reliance on professional judgment whatsoever, in their decisions regarding the separation of M.W. and V.W. and their placement in separate foster homes."  (*Id.* ¶ 51.)

The question presented by Defendants' motions to dismiss Count II, is whether there is a fundamental right to familial association between biological siblings protected by either the First or Fourteenth Amendment.  By citing *Martinez v. Mafchir*, 35 F.3d 1486 (10th Cir. 1994), Defendants seem to acknowledge that at least an "abstract fundamental liberty interest in family integrity" is

protected by the Fourteenth Amendment. *Id.* at 1490 (citing *Lehr v. Robertson*, 463 U.S. 248 (1983) (other citations omitted)).  However, Defendants ignore *Trujillo v. Bd. of County Comm'rs of Santa Fe*, in which the Tenth Circuit explicitly recognized the existence of a constitutionally protected right of association between siblings. 768 F.2d 1186 (10th Cir. 1985).  In that case, the Tenth Circuit concluded that *both* a mother and sister "had constitutionally protected interests in their relationship with their son and brother." *Id.* at 1189.  The court based its conclusion on *Roberts v. United States Jaycees*, in which the United States Supreme Court recognized that under our Constitution "freedom of association receives protection as a fundamental element of personal liberty" in addition to the protections it receives under the First Amendment.[1] 468 U.S. 609, 618 (1984).  "The Court has long recognized that, because the Bill of Rights is designed to secure individual liberty, it must afford the formation and preservation of certain kinds of highly personal relationships a substantial measure of sanctuary from unjustified interference by the State." *Id.*  Moreover, the Court concluded that "[p]rotecting these relationships from unwarranted state interference . . . safeguards the ability [to] independently . . . define one's identity that is central to any concept of liberty." *Id.* at 619.

The issue in the instant case is whether this constitutional liberty interest in association reaches that relationship biological siblings enjoy.  Although the *Trujillo* court recognized the preeminence of the parental relationship in familial associational rights, the court could not conclude that "other intimate relationships are unprotected and consequently excluded from the remedy established by section 1983." 768 F.2d at 1189 (citing *Roberts*, 468 U.S. at  620 (stating "a broad range of human relationships . . . may make greater or lesser claims to constitutional protection")).

_____

[1] Given the Court's conclusion, discussed below, that the Plaintiff has stated a claim for a constitutionally protected liberty interest in M.W.'s relationship with her sister, the Court finds it unnecessary to decide whether she has also stated an associational claim under the First Amendment.

The *Trujillo* court explicitly found that a sister has a constitutionally protected freedom of intimate association with her brother. *Id.* The court also noted, in *dicta*, that "familial relationships . . . do not form the outer limits of protected intimate relationships." *Id*. at 1189, n. 5 (citing *Roberts*, 468 U.S. at 620). Recognizing that it must "provide a logical stopping place" for intimate association claims, however, the court held "that an allegation of intent to interfere with a particular relationship protected by freedom of intimate association is required to state a claim under section 1983." *Id*. at 1190.

It is true, as Defendants assert, that in *Mafchir* the Tenth Circuit concluded that the right to familial integrity is not absolute or unqualified. 35 F.3d at 1490. The Circuit also noted that the right is amorphous and should always be balanced against the governmental interests involved. *Id*. However, the *Mafchir* court's failure to refer to *Trujillo* can hardly be used as evidence that the Circuit intended to overrule its recognition of a sibling's right to assert associational rights in limited circumstances. Nor can one reasonably conjecture that *Mafchir* indicates that the Tenth Circuit was uneasy with its decision in *Trujillo*, as Defendants suggest. (*See* Defs. Elam and Sandberg's Reply at 4.)

This Court concludes that *Mafchir* and *Trujillo* are, in fact, in accord: associational rights between siblings are fundamental interests and are constitutionally protected, however, such claims are strictly limited. In this case the Plaintiff has stated a claim under 42 U.S.C. § 1983 by alleging, as *Trujillo* requires, that Defendants "intentionally interfered with [M.W.'s] familial relationship with knowledge that their actions would adversely affect [her] relationship" with her sister (Compl. ¶ 51.) This does not end the inquiry, however. M.W.'s associational claims must be balanced against the Government's important interest in protecting her physical and emotional safety. *See Mafchir*, 35

-5-

F.3d at 1490 (noting that the constitutional right to familial association should "always . . . be balanced against the governmental interest involved"); *Griffin v. Strong*, 983 F.2d 1544, 1547-48 (10th Cir. 1993) (requiring balancing of interests).  One can certainly imagine circumstances which would justify the placement of two siblings in separate foster homes, however, such conjecture is not the task before the Court. The Complaint's allegations that the Defendants acted with knowing, reckless, or callous disregard for the children's associational rights and that the Defendants intentionally interfered with those rights without justification are sufficient to tip this balancing in M.W.'s favor for purposes of this motion to dismiss. (Compl. ¶ 51.)   M.W. has stated a claim—sufficient to overcome the requirements of *Trujillo*—for violations of her protected right under "the Constitution, to continue, maintain and develop an intimate familial relationship" with her biological sister.  (Compl. ¶ 49).   Therefore, the motions to dismiss Count II will be denied.

## MOTIONS TO DISMISS BY THE OLIVAS DEFENDANTS

Rochelle and Santiago Olivas, the foster parents accused of abusing the two minor plaintiffs, have both moved to have the claims made against them dismissed on the grounds that they were not acting under the color of state law and, therefore, cannot be liable under 42 U.S.C. § 1983.  *See Wyatt v. Cole*, 504 U.S. 158, 161 (1992) (noting that the purpose of Section 1983 "is to deter state actors from using the badge of their authority to deprive individuals of their federally guaranteed rights").  In their separate motions to dismiss, both Olivases argue that as foster parents—as opposed to the social worker defendants—they were not "state actors" and that they were not acting "under the color of state law" when they allegedly caused the injuries M.W. suffered.  As authority, the Olivas Defendants cite to case law involving foster parents and others in states other than New Mexico. (*See* Def. Santiago Olivas's Mem. Supp. Mot. Dismiss at 5-8; Def. Rochelle Olivas's Mem.

Supp. Mot. Dismiss at 11-17.)  The question here, however, is whether the Olivas Defendants were acting under the color of New Mexico law, not under the color of some other state's law.  Therefore, it is only appropriate to use the cited extra-jurisdictional authority to determine what criteria may be used to judge whether foster parents in New Mexico can act under the color of state law, not whether they are in fact state actors.  To answer that question, this Court must look to New Mexico law.

"The [United States Supreme] Court has taken a flexible approach to the state action doctrine, applying a variety of tests to the facts of each case." *Gallagher v. Neil Young Freedom Concert*, 49 F.3d 1442, 1447 (1995).  The "under the color of state law" requirement is "a jurisdictional requisite for a § 1983 action, . . . which like its state action counterpart furthers the fundamental goals of preserving individual freedom by limiting the reach of federal law and federal judicial power and avoiding imposing on the State . . . responsibility for conduct for which they cannot fairly be blamed." *Jojola v. Chavez*, 55 F.3d 488, 491 (10th Cir. 1995) (internal quotations and citations omitted). Thus, unless complained of actions are "fairly attributable" to the state, they are simply not actionable under 42 U.S.C. § 1983.  The Court must determine then, whether the actions the Plaintiff allege the Olivas Defendants took were private acts or were acts that were "fairly attributable" to the state by virtue of their status as foster parents.

As the parties have observed, an act is under the color of state law if the defendant ". . . exercised power possessed by virtue of state law and made possible only because the wrongdoer is clothed with the authority of state law." *Id*. at 492-93.  The Plaintiff has made numerous allegations that the acts taken by the Olivas Defendants were made possible only as a result of the authority the state placed in them by granting them a licence as foster parents and by placing the children with the Defendants.  Plaintiff Bailey alleges that the Olivas Defendants were licenced to be foster parents in

late 1994 or early 1995 and that they were selected to be the foster parents for M.W. and V.W. in May 1995.  (Compl. ¶ 16.) Plaintiff specifically alleges that *but for* the authority granted to them by the state, the Olivas Defendants would not have had access to the children and would not have exercised the "untoward authority and absolute control over the life of very young children entirely dependent on them for their day-to-day existence" which permitted them to cause the injuries M.W. is alleged to have suffered.  (*Id.* ¶ 60.) In addition, the Plaintiff alleges that the Olivas Defendants "acted as agents of the State," were licenced to provide care for children who were in the legal custody of CYF, and that the Olivas Defendants were in fact "public employees" as defined by the New Mexico Tort Claims Act, N.M. Stat. Ann. § 41-4-3. (*Id.* ¶ 58.)  Moreover, the Plaintiff alleges that the Olivas Defendants had received specialized training on foster parenting from the state and had "significant contacts with the State and were subject to extensive and exacting regulation by the State in the performance of their duties" as foster parents. (*Id.* ¶ 59.)  Most significant to the Court, however, is that the Plaintiff has alleged that the state had legal custody of the children and deliberately placed the Olivases in direct and daily control of the physical custody of M.W. and her sister.  (*Id.* ¶¶ 20, 23, 60.)

Those courts that have explained the basis for their refusal to recognize foster parents as state actors,[2] have focused on the very limited relationship that existed between those particular state social services agencies and the foster parents.  *See e.g. Milburn v. Anne Arundel County Dept. of Social*

---

[2] Two of the four cases cited by Defendants as authority that foster parents are not state actors fail to sufficiently explain their rationale for their conclusion that foster parents are not liable under 42 U.S.C. § 1983.  *See Pfoltzer v. County of Fairfax*, 775 F.Supp. 874, 884-85 (E.D. Va. 1991) (holding "[n]or are foster parents state actors where, as here, the foster homes were not operated by the Department"); *McCrum v. Elkhart County Dept. of Public Welfare*, 806 F.Supp 203, 208 (N.D. Ind. 1992) (concluding "the court does not believe that foster parents act under the color of state law").

*Services*, 871 F.2d  474, 476-77 (4th Cir. 1989) (finding foster parents not "state actors" because there was no "intimate relationship between the state and foster parents nor any detailed guidance of the [foster parents] nor any regulation of the conduct complained of;" contract between the state and the foster parents did not call for any specific conduct by foster parents; and there was no compensation to the foster parents); *Lintz v. Skipsky*, 807 F.Supp. 1299 (W.D. Mich.  1992) (finding foster parents not "state actors" under the symbiotic relationship or nexus test because limited regulation and concluding reimbursement for child care expenses do not by themselves "convert a private party's action into that of a state").  The Tenth Circuit has used the "nexus test," among others, to determine whether a private party's action can be fairly attributed to the state. *Jojola*, 55 F.3d at 494.  Under this test, the Plaintiff must "plead and ultimately establish, the existence of 'a real nexus' between the defendant's conduct and the defendant's 'badge' of state authority in order to demonstrate [an] action was taken 'under the color of state law.'"  *Id*.

The Court finds that in New Mexico—under the facts alleged by the Plaintiff—the state has entwined  itself deeply in the parenting duties of foster parents. (*See e.g*. Compl. ¶¶ 57, 58  (alleging "specialized training" for foster parents and alleging that the Olivases had "significant contacts with the State and were subject to extensive and exacting regulation") Significantly, the State has deliberately opened itself up for liability under the Tort Claims Act for actions taken by foster parents which result in certain injuries to their charges and has defined foster parents as "public employees." *See* N.M. Stat. Ann. § 41-4-3(E); (Compl. ¶ 58).  The Court is compelled to accept the legislative

judgment of the State of New Mexico and finds, for purposes of this motion to dismiss, that the Olivas Defendants are state employees.[3]

Moreover, the State retained legal custody over M.W. and selected these particular foster parents to take physical custody of her and to provide for her well-being. (Compl. ¶¶ 20-23.) These allegations regarding the custody of M.W. are of particular significance to the Court as they relate directly to the basis for constitutional claims for injuries suffered while a child is in foster care. *See Yvonne L. v. New Mexico Dep't of Human Services*, 959 F.2d 883, 893 (10th Cir. 1992) (holding "children *in the custody of the state* ha[ve] a constitutional right to be reasonably safe from harm") (emphasis added). The Plaintiff's allegation that the State had granted the Olivases the power to hold M.W. in their physical custody—against her will—is what sets these foster parents apart from other state licencees or employees who might not "act under the color of state law." In this sense, the Olivases were acting like the most common Section 1983 defendant: the police officer. Plaintiff has alleged that these foster parents—like police officers—were granted one of the most coercive powers of the state, the power to control an individual's liberty. It is the exercise of this power that most clearly places the actions of the Olivases "under the color of state law."

---

[3] It is true that being defined as a public employee does not *ipso facto* bring all of the Olivases actions under the scope of Section 1983. However, the Court notes that the case primary relied on by the Defendants to support their assertion that the Court should not find that the Olivases were acting under the color of state law, even if it concludes that they were "state employees" is easily distinguished on the facts. In *Polk County v. Dodson*, 454 U.S. 312 (1981), the Supreme Court did find that that Defendant's status as a public employee was insufficient to establish section 1983 liability, however, in that case, the Defendant was a Public Defender. The Court finds that a foster parent in New Mexico is more akin to a state run orphanage employee—for purposes of Section 1983 liability—than a private parent. Unlike the public defender, the foster parent is not protecting the child from the state, but is providing care for the child at the behest and under the supervision of the state.

-10-

Taking all of the Plaintiff's allegations as true,  the Court concludes that the Olivases were acting under the color of state law when they allegedly caused the injuries suffered by M.W.  It is clear that the Plaintiff has met her burden to plead a "real nexus" between the authority the State granted the Olivases and the conduct they are alleged to have committed.  If the state had not placed M.W. in the physical custody of the Olivases and given the Olivases the authority they purportedly exercised as foster parents, M.W. would not have suffered the horrific injuries alleged.  Therefore, the Court will deny the Olivases' motions to dismiss.

Rachel Olivas makes the alternative argument that even if she were acting under the color of state law, she is entitled to partial dismissal on the basis of qualified immunity. (Def. Rachel Olivas's Mem. Supp. Mot. Dismiss at 17-22.)  Ms. Olivas asks this Court to dismiss certain allegations—as opposed to specific counts—arguing that she should be granted qualified immunity for many of her alleged acts.    As Ms. Olivas asserts, to overcome qualified immunity, a Plaintiff must allege "that the Defendant's conduct violated the law and that that law was clearly established when the alleged violation occurred."  *Pueblo Neighborhood Heath Centers, Inc. v. Lasavio*, 847 F.2d 642, 646 (10th Cir. 1988).  The *Yvonne L.* court noted, "foster children, like involuntarily committed patients, are 'entitled to more considerate treatment and conditions' than criminals.'" 959 F.2d at 894.  Despite this, Ms. Olivas asks the Court to adopt the deliberate indifference standard used in claims made under the Eighth Amendment rather than the professional judgment standard adopted by the *Yvonne L* court.  *Id.* at 893 (holding that state officials are "shielded from liability unless the defendants show. . . that [defendants] failed to exercise professional judgment").

-11-

The Court does not need to decide—and will not decide—which standard[4] would be appropriate to apply to foster parents in these circumstances. The Plaintiff has alleged in her Complaint that the Olivas Defendants acted "knowingly, recklessly, negligently *or with deliberate indifference* and callous disregard" for the rights of the two minors. (Compl. ¶ 63 (emphasis added).) Moreover, Plaintiff made numerous factual allegations which support her general allegation that Rochelle Olivas at least acted with deliberate indifference. These include allegations of physical harm to M.W. inflicted by the Olivases, the allegations that M.W. suffered numerous bruises that could not be medically explained, the allegation that M.W. failed to thrive while in the custody of the Olivases, and the allegation that CYF had concluded that the bruising "was a result of Muchausen syndrome by proxy." (Compl. ¶¶ 24-35.) Therefore, even if the Court were to apply the deliberate indifference standard Ms. Olivas requests, she would not be entitled to qualified immunity.

By 1992, it was clearly established in the Tenth Circuit that foster children have a right to be placed in a safe environment. *Yvonne L.*, 959 F.2d at 892-93. Similarly, it was clearly established in the Tenth Circuit by 1985 that siblings have a constitutionally protected right to association. *Trujillo*, 768 F.2d at 1189. The Plaintiff has alleged that Ms. Olivas acted—at a minimum—with deliberate indifference towards M.W.'s clearly established, fundamental constitutional rights to be placed in a safe environment and to maintain her intimate familial relationship with her sister. Therefore, Ms. Olivas's alternative motion for partial dismissal based on qualified immunity will be denied as well.

---

[4] The *Yvonne L.* court also noted that when these standards are "applied to a foster care setting [it is unlikely that] there is much of a difference in the two standards," however, to the extent there was a difference, the court applied the professional judgment standard set out in *Youngberg v. Romero*, 457 U.S. 307, 315-16 (1982).

-12-

## MOTIONS TO DISMISS ON THE BASIS OF QUALIFIED IMMUNITY

A.    Associational Rights Claim

Defendants Buchanon, Kalejta, Osborne, Grindell, Mullen, Gonzales, Sandberg and Elam all argue in their various motions that they are entitled to qualified immunity on the Plaintiff's claim for deprivation of M.W.'s associational rights with her biological sister V.W.  This argument is based upon their assertion that there was no clearly established right to intimate association between siblings.  As the Court has observed, "[o]nce the qualified immunity defense is properly raised, a plaintiff must make a two-fold showing: first, that a defendant's conduct violated federal law; and second, that such law was clearly established when the alleged violation occurred."  *Spielman v. Hildebrand*, 873 F.2d 1377, 1383 (10th Cir. 1989) (citations omitted).  "The contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right."  *Losavio*, 847 F.2d at 646 (internal quotations omitted).

The Court has already concluded that there is a constitutionally protected right to association between siblings for which M.W. has stated a claim.  This right was recognized by the Tenth Circuit in 1985 in *Trujillo*, 768 F.2d at 1189, and it has been clearly established in this Circuit since that time.  However, Defendants argue that even if there was a clearly established right to intimate association, this right does not extend to the circumstances presented in this case.  Defendant argues correctly that the associational rights of the sisters must be balanced against the interests of the state in preventing harm.  *Mafchir*, 35 F.3d at 1490.

However, as this is a motion to dismiss, the Plaintiff's allegations must be taken as true, "and all reasonable inferences must be indulged in favor of the plaintiff."  *Shaw v. Valdez*, 819 F.2d 965, 968 (10th Cir. 1987).    "The same rule applies when [qualified] immunity is urged as a defense by

-13-

a motion to dismiss." *Chrissy F. v. Mississippi Dep't of Pub. Welfare*, 925 F.2d 844, 846 (5th Cir.

1991); *see also Behrens v. Pelletier*, 516 U.S. 299, 309 (1996) (noting that court should examine

defendant's conduct as alleged in the complaint to determine the applicability of qualified immunity).

Here the plaintiff has alleged that the Defendants "intentionally interfered with [M.W. and V.W.'s]

familial relationship with knowledge that their actions would adversely affect [the sisters']

relationship." (Compl. ¶ 51.)  Even considering the alleged abuse in the Olivas home, this allegation,

taken in the light most favorable to the Plaintiff, cannot be dismissed merely as a necessary evil in the

balancing of the associational rights and the State's interest in protecting the children.  Moreover,

Plaintiff specifically alleges that Defendants' intentional interference  "substantially departed from

accepted professional judgment, practice or standards so as to abdicate reliance on professional

judgment whatsoever, in their decisions regarding the separation of M.W. and V.W. and their

placement in separate foster homes."  (Compl. ¶ 51.)  Thus, the Plaintiff alleges that the separation

of the sisters was an unnecessary act, which departed from accepted professional practice, and was

intended to interfere with their constitutionally protected relationship.  After discovery is completed,

a *Mafchir* balancing of the children's associational rights with the interests of the state may have a

different outcome.   However, Plaintiff's allegation that each of the Defendants "intentionally

interfered with [M.W. and V.W.'s] familial relationship with knowledge that their actions would

adversely affect that relationship" and her allegation that this interference could not be justified, are

certainly sufficient to tip the balance in favor of the children's rights on a motion to dismiss. (*Id.*)

Moreover, the Complaint alleges that Defendants "Mullins, Elam, Osborne, Kalejta and/or Buchanan

approved of, ratified, and/or authorized the improper [interference with the children's relationship

by] their subordinates, for whom they had supervisory responsibility by their deliberate indifference

-14-

in failing to supervise the conduct of these subordinates."[5]   (Compl. ¶ 52(C).)   Based on these allegations, the Court can only conclude that a reasonable official taking the actions Defendants are alleged to have taken would have understood that what he was doing violated the sisters' constitutional right to association.  *Losavio*, 847 F.2d at 646. Therefore, the Court will deny each of the Defendant's motions to dismiss Count II on the basis of qualified immunity.

B.      Claims for Physical and Emotional Injuries

        Defendants Buchanon, Kalejta, Osborne, Grindell, Mullen, Gonzales, Sandberg and Elam also seek to have the claims made in Counts I and IV relating to the injuries suffered by M.W. dismissed on the basis of qualified immunity.  While Defendants acknowledge that at the time of the alleged incidents there was a clearly established right for foster children to be placed in a safe environment, they argue that there was no "clearly established right for a child to not be placed in a home which is under investigation."  (*See* Defs. Kalejta and Buchanon's Mem. Supp Mot. Dismiss at 10; Defs. Osborne, Grindell, Mullen & Gonzales's Mem. Supp. Mot. Dismiss at 13-15.)  Defendants give lip service to the accepted rule that when considering  motions to dismiss that the Court must accept the well pleaded facts as true and construe all inferences in favor of the Plaintiff, even when the basis for the motion is the affirmative defense of qualified immunity.  *See Chrissy F.*, 925 F.2d at 846;

---

        [5] The Court notes that the Defendants Kalejta and Buchanon argue that there is no affirmative link between any action they took and the alleged depravation of the sisters associational rights and that the associational claims against them should, therefore, be dismissed.  (Defs. Kalejta and Buchanon's Mem. Supp. Mot. Dismiss at 17.)  The Defendants focus on the "staffing" and their insistence that there is no allegation that they participated in the final decision misses the point.  Plaintiff specifically alleges that Kalejta and/or Buchanon "approved of, ratified, and authorized" the separate placement of the two children. Taking the allegations  as true and making all reasonable inferences in favor of the Plaintiff, the Court must conclude that the Complaint states a claim against all defendants for a violation of the sisters's associational rights.

*Behrens*, 516 U.S. at 309.  However, they repeatedly construe facts in their favor and attempt to indirectly introduce facts not alleged in the Complaint.

The most striking example of this is their oft repeated assertion that the Plaintiff is claiming that the children had a constitutional right to not be placed in a foster home under investigation.  The Court does not share this view of the Plaintiff's claim. The Plaintiff has alleged that the Defendants "knew or should have known that Santiago and Rochelle Olivas failed to meet the minimum standards required to be foster parents, were unfit to be foster parents, and should not have been placed in a position of authority and supervision over M.W. and V.W." (Compl. ¶¶ 14, 17).  The Plaintiff further alleges that Defendants  . . . Gonzales, Grindell and Sandberg "knew of, or were recklessly and deliberately indifferent to, the physical and sexual abuse, injuries and constitutional violations suffered by M.W. and V.W. at the hands of her state-selected foster parents."  Moreover, she alleges that "Defendants . . . Gonzales, Grindell and Sandberg . . . failed to remove M.W. from the home when it was apparent that no medical explanation existed for the repetitive bruising, or to take protective measures *when they were aware* that M.W. and V.W. were at risk and totally abdicated their roles as professionals and protectors of their interests."  (*Id.*(emphasis added).)  Likewise, Plaintiff alleges that Defendants Mullins, Elam, Osborne, Kalejta and Buchanon, as supervising social workers "knew of, or were recklessly and deliberately indifferent to, the physical, emotional, and sexual abuse, injuries and constitutional violations suffered by M.W. and V.W. at the hands of their state-selected foster parents" and failed to take protective action once they knew the children were at risk. (Compl. ¶¶ 39-40.)  In other words, Plaintiff alleges that Defendants Grindell, Gonzales, and Sandberg placed M.W. and V.W. in a home which they knew or should have known was dangerous and failed to remove them from the home once they knew they were at risk of serious injury.  Plaintiff further

-16-

asserts that the supervisors of Defendants Grindell, Gonzales, and Sandberg, Defendants Mullins, Elam, Osborne, Kalejta and Buchanon, knew of the danger the children were in and failed to take action to protect the children.   This is not an assertion of a constitutionally protected right to not be placed in a foster home under investigation, this is an assertion of a right to be placed in a safe environment and to be removed from a foster home when it becomes apparent that it is unsafe and the foster children are at a clear risk of great harm.

There is no doubt—and Defendants admit—that foster children have a constitutionally protected right to be placed in a safe environment.   The Tenth Circuit has held that since 1983 it has been well established that "children in the custody of a state ha[ve] a constitutional right to be reasonably safe from harm; [and] if the persons responsible place children in a foster home . . . that they know or suspect to be dangerous to the children they incur liability if the harm occurs."   *Yvonne L.*, 959 F.2d at 893.[6]   However, this liability is not for any action taken by state welfare workers which results in harm to children in the custody of the state.   Rather, the *Yvonne L.* court found that state officials are shielded from liability for injuries suffered by children in foster care, unless it can

_____

[6] In reaching this conclusion, the Tenth Circuit relied upon the Supreme Court's holding in *Youngberg v. Romero*, 457 U.S. at 324, that retarded persons committed to state custody have a substantive due process right to "reasonable care and safety;" the Court's holding in *DeShaney v. Winebago County Dep't of Social Servs.*, 489 U.S. 189, 199-200 (1989)  that "when the State takes a person into custody and holds him there against his will, the Constitution imposes upon it a corresponding duty to assume some responsibility for his safety and general well-being" and its conclusion in *dicta* that foster care may impose this same affirmative duty.   Additionally the *Yvonne L.* court relied upon three Circuit opinions to support its conclusion that there was "a clearly established right to reasonable safety while in foster care.   *See Doe v. New York City Dep't of Social Services*, 649 F.2d 134 (2nd Cir. 1981) (holding that a child in the custody of the state has a right to not be placed in a environment known to be unsafe); *K.H. v. Morgan*, 914 F.2d 846, 853 (7th Cir. 1990) (holding that foster children have a constitutional "right not to be placed with a foster parent who the state's caseworkers and supervisors know or suspect is likely to abuse or neglect the foster child); *Taylor ex rel. Walker v. Ledbetter*, 818 F.2d 791 (11th Cir. 1987) (*en banc*) (same).

be shown that they failed to exercise professional judgment in their placement and monitoring decisions. *Id*. at 893. "'Failure to exercise professional judgment' does not mean mere negligence . . . ; while it does not require actual knowledge the children will be harmed, it implies abdication of the duty to act professionally in making placements." *Id*. at 894. In the instant case, Plaintiff has alleged that both the placement social workers and the supervisory social workers had either *actual knowledge* of the harm the children had suffered and might suffer, or that they were reckless and deliberately indifferent to the harm and that they failed to exercise professional judgment. (*See e.g.* Compl. ¶¶ 38-39.)

It is true that "[o]fficials are not liable for bad guesses in gray areas; [however,] they are liable for transgressing bright lines." *Maciariello v. Sumner*, 973 F.2d 295, 298 (4th Cir. 1992). The allegations contained in the complaint, including those stated in Counts I and IV clearly allege that the placement social workers and their supervisors transgressed bright lines and were directly responsible for knowingly placing M.W. in an environment which was so dangerous that the injuries she suffered were inevitable. Plaintiff's allegations of the injures M.W. suffered, the Defendants alleged knowledge of those injuries, and their alleged failure to monitor or review the home despite their alleged knowledge of the unsafe conditions of M.W.'s environment are sufficient to overcome the professional judgment standard and state a claim under 42 U.S.C. § 1983.

C.    The Adoption Assistance and Child Welfare Act Claims

Finally, Plaintiff makes claims in Count V under the Adoption Assistance and Child Welfare Act (AACWA), a statute which conditions federal funding upon each state's compliance with certain requirements. Defendants Osborne, Grindell, Mullen, Gonzales, Sandberg, and Elam argue that the AACWA does not entitle the Plaintiff to relief, as that statute places obligations upon the state, not

the individuals Plaintiff has chosen to sue in their individual capacities.  As the parties have pointed

out, Section 671(a) of the AACWA requires, in relevant part, that the states accepting funding have

a plan that

> (3)    provides that the plan shall be in effect in all political subdivisions of the State, and, if administered by them, be mandatory upon them; . . .
>
> (9)    provides that the State agency will—
>
> > (A)    report to an appropriate agency or official, known or suspected instances of physical or mental injury, sexual abuse or exploitation, or negligent treatment or maltreatment of a child receiving aid . . . under circumstances which indicate that the child's health or welfare is threatened thereby; and
>
> (10)    provides for the establishment or designation of a State authority or authorities which shall be responsible for establishing and maintaining standards for foster family homes and child care institutions which are reasonably in accord with recommended standards of nation organizations concerned with standards of such institutions or homes, including standards related to admission policies, safety, sanitation, and protection of civil rights, and provides that the standards so established shall be applied by the State to any foster family home or child care institution receiving funds . . . .
>
> (15)    provides that, in each case, reasonable efforts will be made (A) prior to placement of a child in foster care, to prevent or eliminate the need for removal of the child from his home . . . .

42 U.S.C. § 671(a)(3), (9), (10), and (15).  Plaintiff has alleged that each of the above quoted

subsections were violated by all of the CYF Defendants.  Specifically, the Plaintiff has alleged that

the Defendants failed to report the "known or suspected instances of . . . abuse . . ;" "failed to

establish, maintain or follow standards for foster family homes . . . which were reasonably in accord

with recommended standards," and "failed to take reasonable efforts to prevent or eliminate the need

for removal of these children from the Olivas Defendants' foster home" as the Act required.  (Compl.

¶¶ 76-78.)

The Court first notes that the Plaintiff has agreed in her response to this motion to voluntarily dismiss her claims under 42 U.S.C. §§ 671(a)(15) in light of the Supreme Court's holding in *Suter v. Artist M.*, 503 U.S. 347 (1992) that that subsection of the AACWA does not create a private claim for relief.   However, Plaintiff goes on to argue that her remaining claims[7] remain viable in light of Congressional enactment of 42 U.S.C. § 1320a-2 overturning certain parts of the *Suter* decision. That statute states in relevant part:

> In an action brought to enforce a provision of this chapter, such provision *is not to be deemed unenforceable because of its inclusion in a section of this chapter requiring a State plan or specifying the required contexts of a State plan*.  This section is not intended *to limit or expand* the grounds for determining the availability of private actions to enforce State plan requirements other than by overturning any such grounds applied in *Suter v. Artist M.*, 112 S.Ct. 1360 (1992), but *not applied in prior* Supreme Court decisions respecting such enforceability . . . .

(emphasis added).  Because Congress made clear that this legislation was not intended to "limit or expand" the grounds for determining whether any of the subsections could provide a private cause of action, and because the legislation is clearly not intended to affect the force of previous decisions on this issue, the Court must conclude that the legislation was not intended to overturn pre-*Suter* decisions like *Yvonne L.*   Rather, the legislation was intended to prevent courts from concluding that

---

[7] The Court does not understand the Plaintiff to be pursuing a separate claim under 42 U.S.C. § 671(a)(3) despite her comment in her Response that her dismissal of claims made under 671(a)(15) "does not diminish the force of the Plaintiff's remaining claims under Sections 671(a)(**3**)(9) and (10)." (emphasis added).  The Court reaches this conclusion because it can see no allegation in the Complaint relating to subsection 671(a)(3), other than a quotation of the subsection in paragraph 75, and finds no discussion of any claim made under this subsection in the Plaintiff's response to the instant motion.  Moreover, subsection 671(a)(3) simply requires that a state's "plan shall be in effect in all political subdivisions of the State" and Plaintiff makes no allegation that New Mexico's plan was not in effect in any particular subdivision.  Therefore, the Court need only consider whether subsections 671(a)(9) and (10) can support private causes of action.

merely because the AACWA is a funding statute, none of its requirements can create a private right of action.

In *Yvonne L.* the Tenth Circuit concluded that subsection 671(a)(10)—one of the two remaining subsections at issue here—did not create a private right of action because it was so "vague or amorphous" that it cannot be judicially enforced. 959 F.2d at 889. The Court based its reasoning, not on *Suter*, but on the private right of action analysis contained in *Wilder v. Virginia Hospital Ass'n*, 496 U.S. 498, 509 (1990) and *Wright v. City of Roanoke Redev. & Hous. Auth.*, 479 U.S. 418 (1987). The Tenth Circuit explicitly found that the AACWA was intended to benefit children in foster care and that the obligations set out in the AACWA were mandatory upon participating states; meeting the first two *Wilder* factors. *Yvonne L.*, 959 F.2d at 886-88. However, the Circuit concluded that section 671(a)(10)'s requirement that the state plan must "maintain[] standards for foster family homes and child care institutions which are reasonably in accord with *recommended standards of nation organizations*" was "the type of vague and amorphous language identified in *Wilder*, 110 Sct. at 2517, and *Wright*, 479 U.S. at 431 U.S. at 431-32, . . . that cannot be judicially enforced. *Yvonne L.*, 959 F.2d at 889 (emphasis added). The Court concluded, therefore, that no private cause of action was created. *Id*. This Court remains bound by the *Yvonne L.* conclusion that subsection 671(a)(10) of the AACWA is too "vague and amorphous" to create a private cause of action and, therefore, it will dismiss the claims made under this subsection. *Id*.; *see also Pearcy v. Douglas, et al.*, No. CIV. 95-307 BB/DJS (D.N.M. filed Oct. 2, 1996).

Finally, the Court adopts the reasoning and analysis of the *Pearcy* court and concludes that the remaining subsection, 671(a)(9)—unlike subsections (10) and (15)—does create a private right of action. *Id.* Like the *Yvonne L.* court, this Court concludes that the first two *Wilder* factors are

satisfied, as the AACWA was intended to benefit foster children like M.W. and its state plan

requirements were intended to be mandatory upon participating states.  959 F.2d. at 886-89.  The

final question is whether the language in the remaining subsection is too "vague or amorphous" to

create a private right of action.  Section 671(a)(9) requires states to "report to an appropriate agency

or official, known or suspected instances of . . . sexual abuse or exploitation . . . of a child . . . under

circumstances which indicate that the child's health or welfare is threatened thereby."  42 U.S.C.

§ 671(a)(9).  As the *Pearcy* Court noted "the terms of this statutory provision are not absolutely

precise:  the state agency has discretion in determining what agency or official is 'appropriate,' and

need not report instances of abuse if circumstances do not indicate that the child's health or welfare

is threatened."  *Id.* (citing 42 U.S.C. § 671(a)(9)).

> However, [the *Pearcy* court found] ...to be enforceable, a statute need not
> absolutely precise, but rather need only give the courts discernible guidance regarding
> enforcement.  *See Wilder*, 496 U.S. at 519-20; *Yvonne L.*, 959 F.2d at 898 (some
> sections of AACWA may be privately enforceable).  The Court anticipates no
> extraordinary difficulty in determining whether any agency to which Defendants may
> have reported Defendant Neff's known or suspected abuse of Plaintiffs was
> "appropriate" within the meaning of subsection 671(a)(9).  Likewise, whether
> Defendant Neff's alleged abuse threatened Plaintiffs' health or welfare does not
> appear to present any inordinately complicated issues.  The Court therefore finds that
> in the present matter, subsection 671(a)(9) is not too vague and amorphous to be
> judicially enforced and satisfies the third *Wilder* factor.  *Wilder*, 496 U.S. at 509; *see
> also L.J. v. Massinga*, 838 F.2d 118, 123 (4th Cir. 1988) (Various provisions of
> section 671(a), including subsection (9), "spell out . . . rights in plaintiffs [and] are
> privately enforceable under 42 U.S.C. § 1983."), *cert. denied*, 488 U.S. 1018 (1989).

No. CIV. 95-307 BB/DJS, slip. op.  at 8-9.  The Court concludes, as did the *Pearcy* court, that

section 671(a)(9) creates a private right of action under which the Plaintiff has stated a claim on

behalf of M.W.  The Defendants' motion to dismiss the claims in Count V will be granted in part and

those claims made under the AACWA's sections 671(a)(10) and (15), will be dismissed, however, the claims made under section 671(a)(9), remain viable.

### MOTION FOR SUMMARY JUDGMENT BY DEFENDANT PACHECO

Defendant Pacheco moves for Summary Judgment arguing that the undisputed material facts show that he had no personal involvement in the wrongful acts alleged in the Complaint or alternatively that he is entitled to qualified immunity as he acted with professional judgment. (Def. Pacheco's Mot. Summ. J. at 5-9.) Defendant Pacheco provides an affidavit in which he asserts that while he removed M.W. from the custody of her mother, and later from the custody of the Olivas Defendants, he only placed the children in foster homes on an emergency and temporary basis until some of the other Defendants made the placements complained of in the Complaint. (*See* Affidavit attached to Def. Pacheco's Mot. Summ. J.) Moreover, he asserts that he was not responsible for M.W.'s case at the time of any of the complained of actions. (*Id.*)

Plaintiff responds that because no discovery has taken place, Defendant Pacheco's motion is premature. (Resp. at 3 (citing *Celotex Corp. v. Catrett*, 477, U.S. 317, 322 (1986); *Tiberi v. Cigna Corp.*, 89 F.3d 1423, 1428 (10th Cir. 1996).) Plaintiff then sets out specific discovery she would require to "justify her opposition to Pacheco's motion." (Resp. at 5.) In a supplemental submission, however, Plaintiff brings to light—though an affidavit of her expert Virginia Gillmer—facts which are clearly material and in dispute. Ms. Gillmer points to various documents which purport to show that Mr. Pacheco, was involved in the placement of M.W. with the Olivases, that he remained the M.W.'s social worker during her placement with the Olivases, that he failed to exercise professional judgment while she was in his care, and asserting that the transfer of M.W. from Mr. Pacheco to Mr. Gonzales not effective until June 6, 1995. (*See* Affidavit attached to Pl.'s Supplemental Submission.)

The Court concludes that these are material facts which are in dispute and that it must, therefore, deny Defendant Pacheco's Motion for Summary Judgment.  *See* FED. R. CIV. P. 56(c).

**IT IS, THEREFORE, ORDERED** that Defendants Elam and Sandberg's Motion to Dismiss Count II of the Complaint (Docket No. 38), filed February 13, 1997, is **denied**.

**IT IS FURTHER ORDERED** that Defendant Santiago Olivas's Motion to Dismiss Count II of the Complaint (Docket No. 58), filed March 12, 1997, is **denied**.

**IT IS FURTHER ORDERED** that Defendant Santiago Olivas's Motion to Dismiss (Docket No. 81), filed May 20, 1997, is **denied**.

**IT IS FURTHER ORDERED** that Defendant Rochelle Olivas's Motion to Dismiss (Docket No. 44), filed February 20, 1997, is **denied**.

**IT IS FURTHER ORDERED** that Defendants Osborne, Grindell, Mullen, and Gonzales's Motion to Dismiss on the Basis of Qualified Immunity as joined by Defendants Sandberg and Elam (Docket No. 49), filed February 28, 1997, is **granted in part**.

**IT IS FURTHER ORDERED** that all claims made in Count V of the Plaintiff's Complaint pursuant to 42 U.S.C. § 671(a)(10) and (15) are **dismissed with prejudice**.

**IT IS FURTHER ORDERED** that Defendants Kalejta and Buchanon's Motion to Dismiss on the Basis of Qualified Immunity (Docket No. 53), filed February 28, 1997, is **denied**.

**IT IS FURTHER ORDERED** that Defendant Harry Pacheco's Motion for Summary Judgment (Docket No. 34), filed February 13, 1997, is **denied**.

**UNITED STATES DISTRICT JUDGE**