# IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF NEW MEXICO

JUDY BAILEY, guardian *ad litem* and next
friend for M.W. and V.W., minors,

      Plaintiff,

vs.                                      No. CIV 96-959 LH/DJS

HARRY PACHECO, RAUL GONZALES,
SHARON MULLEN, BRENDA SANDBERG,
SUSAN ELAM, MAUREEN GRINDELL,
EFFIE OSBORNE, JOHN KALEJTA, NORA
BUCHANAN, SANTIAGO OLIVAS,
ROCHELLE OLIVAS and JAMES ATKINS, in
their personal capacities acting under color of
state law,

      Defendants.

## <u>MEMORANDUM OPINION AND ORDER</u>

**THIS MATTER** comes before the Court on Defendant John Kalejta's Motion for Summary

Judgment (Docket No. 379), filed July 2, 1999; Defendant Harry Pacheco's Motion for Summary

Judgment (Docket No. 382), filed July 2, 1999; Defendant Jim Atkins' Motion for Summary

Judgment (Docket No. 385), filed July 2, 1999; Defendant Nora Buchanan's Motion for Summary

Judgment (Docket No. 388), filed July 2, 1999; Defendant Elam's Motion for Summary Judgment

(Docket No. 395), filed July 6, 1999; Defendant Sandberg's Motion for Summary Judgment (Docket

No. 399), filed July 6, 1999; Defendant Raul Gonzales' Motion for Summary Judgment and Qualified

Immunity (Docket No. 404), filed July 6, 1999; Defendant Sharon Mullen's Motion for Summary

Judgment and Qualified Immunity (Docket No. 408), filed July 6, 1999; Defendant Effie Osborne's

Motion for Summary Judgment on Qualified Immunity (Docket No. 412), filed July 6, 1999; and

Defendant Maureen Grindell's Motion for Summary Judgment and Qualified Immunity (Docket No.

416), filed July 6, 1999. The Court, having reviewed the Motions, the accompanying memoranda,

and the applicable law, and otherwise being fully advised, finds that Defendant John Kalejta's Motion

for Summary Judgment, Defendant Harry Pacheco's Motion for Summary Judgment, Defendant Nora

Buchanan's Motion for Summary Judgment, Defendant Elam's Motion for Summary Judgment,

Defendant Sandberg's Motion for Summary Judgment, Defendant Sharon Mullen's Motion for

Summary Judgment and Qualified Immunity, Defendant Effie Osborne's Motion for Summary

Judgment on Qualified Immunity, and Defendant Maureen Grindell's Motion for Summary Judgment

and Qualified Immunity are well taken and will be **granted** and that Defendant Jim Atkins' Motion

for Summary Judgment and Defendant Raul Gonzales' Motion for Summary Judgment and Qualified

Immunity are well taken in part and will be **granted in part** and will be **denied in part**.

## BACKGROUND

Plaintiff brings this action on behalf of M.W., a three-year-old girl who suffered serious

injuries while in foster care. The Children, Youth, and Families Department of the State of New

Mexico (CYFD) assumed temporary custody of M.W. and her sister, V.W.,[1] when their natural

mother failed to return for the children after leaving them with a neighbor. CYFD placed the children

with foster parents Rachelle and Santiago Olivas, whom Plaintiff alleges sexually, physically, and

emotionally abused M.W. Plaintiff further claims that Defendants Kalejta, Pacheco, Atkins,

Buchanan, Elam, Sandberg, Gonzales, Mullen, Osborne, and Grindell, all social workers employed

by CYFD (Social Worker Defendants), violated M.W.'s Fourteenth Amendment substantive due

---

[1]  The Court entered Final Judgment on V.W.'s claims on July 24, 1997.

process right not to be placed in an unsafe environment and to be protected from physical, emotion, and sexual abuse by her foster parents. More specifically, Plaintiff asserts that the Social Worker Defendants failed to exercise professional judgment and violated M.W.'s civil rights in licensing the Olivas Defendants as foster parents, placing M.W. in the Olivas home, failing to monitor M.W. while she was with the Olivases, failing to investigate reports of child abuse in the Olivas home, and failing to protect M.W. from continued abuse. The Social Worker Defendants each move for summary judgment on these claims.[2]

## SUBSTANTIVE DUE PROCESS RIGHTS OF FOSTER CHILDREN
## AND THE PROFESSIONAL JUDGMENT STANDARD

Although the Supreme Court has not directly addressed the Fourteenth Amendment substantive due process rights of foster children in the care of the State, in *Youngberg v. Romeo* it determined that involuntarily committed mentally retarded persons have cognizable liberty interests in safe conditions and personal security, freedom from bodily restraint, and training minimally adequate or reasonable[3] to ensure their rights to safety and freedom from undue restraint. 457 U.S. 307, 315-19 (1982). These interests, however, are not absolute. *Id.* at 319-20. Indeed, they may actually be in conflict: There may be times when it is necessary for the State to restrain the residents and "an institution cannot protect its residents from all danger of violence if it is to permit them to have any freedom of movement." *Id.* at 320. Thus, the question that a court must address is "not

---

[2] Concurrently with this Memorandum Opinion and Order, the Court enters its rulings on Defendants Rachelle Olivas's and Santiago Olivas's motions for summary judgment and the Social Worker Defendants' motions for partial summary judgment on Plaintiff's dental surgery and Adoption Assistance and Child Welfare Act claims.

[3] Because a federal court "must identify a constitutional predicate for the imposition of any affirmative duty on a State," "minimally adequate" training is that "which is reasonable in light of identifiable liberty interests and the circumstances of the case." *Youngberg,* 457 U.S. at 319 n.25.

simply whether a liberty interest has been infringed but whether the extent or nature of the restraint or lack of absolute safety is such as to violate due process." *Id.* Therefore, whether an individual's constitutional rights have been violated is determined by "balancing his liberty interests against the relevant state interests." *Id.* at 321.

The *Youngberg* Court further held that "the proper standard for determining whether a State adequately has protected the rights of the involuntarily committed mentally retarded" is "professional judgment." *Id.* This standard requires more of the State than the deliberate indifference standard applied in prisoner Eighth Amendment cases, as the involuntarily committed are entitled to more considerate treatment and conditions of confinement than are criminals. *Id.* at 321-22. On the other hand, meeting the professional judgment standard requires less of the State in justifying use of restraints or conditions of less than absolute safety than do the "compelling" or "substantial" necessity tests. *Id.* at 322.

What is required under the Constitution, then, is "that professional judgment in fact was exercised." *Id.* at 321. A court should not "specify which of several professionally acceptable choices should have been made, *id.*; rather it "must show deference to the judgment exercised by a qualified professional," *id.* at 322. There is "no reason to think judges or juries are better qualified than appropriate professionals in making such decisions," and limited judicial review minimizes "interference by the federal judiciary with the internal operations of these institutions." *Id.; see also id.* at 322 n.29 (citing other Supreme Court cases and academic authority for proposition that courts should exercise deference in reviewing official decisions addressing difficult social problems). Thus, a decision, "if made by a professional, is presumptively valid; liability may be imposed only when the decision by the professional is such a substantial departure from accepted professional judgment,

practice, or standards as to demonstrate that the person responsible actually did not base the decision on such a judgment." *Id.* at 323. Furthermore, "a professional in his individual capacity . . . will not be liable if he was unable to satisfy his normal professional standards because of budgetary constraints; in such a situation, good-faith immunity would bar liability." *Id.*

Relying on *Youngberg*, *Doe v. New York City Dep't of Soc. Servs.*, 649 F.2d 134 (2d Cir. 1981), and *Milonas v. Williams*, 691 F.2d 931 (10th Cir. 1982), the Tenth Circuit held in *Yvonne L. v. New Mexico Department of Human Services* that children in foster care have a clearly established "constitutional right to be reasonably safe from harm; and that if the persons responsible place children in a foster home or institution that they know or suspect to be dangerous to children they incur liability if the harm occurs." 959 F.2d 883, 893 (1992)(*Yvonne L. I*). Again following *Youngberg's* lead, the Tenth Circuit adopted the professional judgment standard for foster care settings, acknowledging that it may well be little different than the Eighth Amendment deliberate indifference standard, but finding compelling the argument that "foster children, like involuntarily committed patients, are 'entitled to more considerate treatment and conditions' than criminals." *Id.* at 893-94 (quoting *Youngberg*, 457 U.S. at 321-22). Interpreting the *Youngberg* standard, the court determined that "'[f]ailure to exercise professional judgment' does not mean mere negligence; while it does not require actual knowledge the children will be harmed, it implies abdication of the duty to act professionally." *Id.* In other words, "'[o]nly if without justification based either on financial constraints or on considerations of professional judgment [state welfare workers and their supervisors] place the child in hands they know to be dangerous or otherwise unfit do they expose themselves to liability in damages.'" *Id.* at 893-94 (quoting parenthetically *K.H. ex rel. Murphy v. Morgan*, 914 F.2d 846, 854 (7th Cir. 1990)(second alteration in *Yvonne L. I*)). Thus, "if defendants

knew of the asserted danger to plaintiffs or failed to exercise professional judgment with respect thereto, . . . and if an affirmative link to the injuries plaintiffs suffered can be shown, then . . . defendants violated plaintiffs' constitutional rights." *Id.* at 890.

When analyzing whether professional judgment was exercised by Defendants, then, the Court first must determine whether the decisions at issue were made by professionals. *Yvonne L. v. Vigil* No. CIV 88-0949 LH, slip op. at *10 (D.N.M. May 10, 1993)(*Yvonne L. II*). "A 'professional' decision maker is one who is 'competent, whether by education, training or experience, to make the particular decision at issue.'" *Id.* at 9 (quoting *Youngberg*, 457 U.S. at 323 n.30 (1982)). If the decisions were made by professionals, they "are presumptively valid and liability may not be imposed." *Id.* at 10.

The burden then shifts to Plaintiff to show a genuine issue of material fact exists as to whether Defendants actually did not base their decisions on professional judgment, by demonstrating evidence that the decisions were "a substantial departure from accepted professional judgment, practice or standards." *Id.* Thus, the question to be determined is "only whether professional judgment was in fact exercised; it is not appropriate for the Court to determine 'which of several professionally acceptable choices should have been made.'" *Id.* at 9 (quoting *Youngberg*, 457 U.S. at 321). Clearly, professional judgment "may be exercised differently by different professionals[;] the [C]ourt is not to attempt to second-guess professionals in their decision-making." *Id.* at 14 ("One professional may utilize different factors in making judgments about placement decisions or may weigh those factors differently from other professionals without having abdicated the duty to act professionally."). Furthermore, good-faith immunity bars liability if professionals are unable to satisfy their normal professional standards because of budgetary constraints. *Id.* at 9 (quoting *Youngberg*, 457 U.S. at

-6-

323).  And finally, "a supervisor will be liable for the constitutional deprivations committed by a supervisee if the supervisor actually participates in or personally directs the deprivation or has actual knowledge of the deprivation and acquiesces." *Id.* at 13 (citing *Woodward v. City of Worland*, 977 F.2d 1392 (10th Cir. 1992)).

## THE SOCIAL WORKER DEFENDANTS' MOTIONS FOR
## SUMMARY JUDGMENT AND QUALIFIED IMMUNITY

The doctrine of qualified immunity protects government officials from individual liability under 42 U.S.C. § 1983 for actions taken while performing discretionary functions, unless their conduct violates "clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982).  When raised in a motion for summary judgment, this defense requires the plaintiff to meet a two-part test: "First, the plaintiff must show the defendant's conduct violated a constitutional or statutory right; second, the plaintiff must show the right the defendant's conduct violated was clearly established such that a reasonable person in the defendant's position would have known the conduct violated the right." *Anaya v. Crossroads Managed Care Sys., Inc.*, 195 F.3d 584, 593 (10th Cir. 1999)(quoting *Lawmaster v. Ward*, 125 F.3d 1341, 1347 (10th Cir. 1997)).  The Court's first task, then, is "to determine whether the plaintiff has alleged any constitutional or statutory violation." *Jurasek v. Utah State Hosp.*, 158 F.3d 506, 516 (10th Cir. 1998)(citing *County of Sacramento v. Lewis*, 523 U.S. 833, ___ n.5, 118 S. Ct. 1708, 1714 n.5 (1998).)

At the outset, the Court finds it necessary to again comment on the constitutional right at issue and the legal standard applicable to analysis of the facts in this case.  Plaintiff incorporates her legal analysis in her response to Defendant Pacheco's Motion for Summary Judgment, (Pl.'s Resp.

Pacheco's Mot. Summ. J. at 2-10), in her responses to each of the other Social Worker Defendants' motions for summary judgment. After a lengthy discussion of how the issue of whether the law was clearly established may be shown by analogy in the Tenth Circuit, (*id.* at 3-7), Plaintiff concludes that M.W.'s constitutional right to be placed in a safe environment has been clearly established in this circuit since the 1992 *Yvonne L. I* decision, (*id.* at 7). Thus, "Plaintiff asserts only [M.W.'s] 'clearly established right to reasonable safety while in foster care,' . . . and the concomitant duty owed by the Social Worker Defendants 'to assume some responsibility for [her] safety and general well-being,'" (*id.* at 8 (citations to *Yvonne L. I* omitted)), and "does not claim that there is a constitutional right to any particular service," (*id.* at 9).

The Court certainly agrees with Plaintiff, to this point. It is here, however, again citing to *Yvonne L. I*, that Plaintiff inexplicably contends that "the constitutional right that *is* guaranteed is a right to the exercise of professional judgment by the State's social workers," (*id.* (emphasis in original)), and that "the proper focus of [Defendants'] claim to qualified immunity is on whether [they] exercised the constitutionally mandated level of professional judgment, not on the specific item to which that judgment was to be focused," (*id.*). As discussed *supra*, it is indisputable that the substantive due process right under the Fourteenth Amendment that a State owes to children in foster care is the right "to be reasonably safe from harm," *Yvonne L. I*, 959 F.2d at 893, not a right to the "exercise of professional judgment." Thus, state officials such as social workers are shielded from liability under 42 U.S.C. § 1983 "unless the defendants showed that they failed to exercise professional judgment," that is, that they abdicated their duty to act professionally, thereby causing the plaintiff's injuries. *Id.* at 893-94 (adopting the standard set forth in *Youngberg*, 457 U.S. 307 and *K.H.*, 914 F.2d 846).

Despite her protestations to the contrary, Plaintiff continually adopts a broader, more expansive articulation of the constitutional rights of foster children than that recognized in the Tenth Circuit. In this regard, Plaintiff's position is similar to that argued by Judge Coffey in his dissent in *K.H.*, 914 F.2d at 854-68. Judge Coffey maintained that foster children have significantly greater rights than those found by the *K.H.* majority: social workers are not only "obligated to exercise reasonable professional judgment in the placement, care and supervision" of foster children, *id.* at 855, but have the duty to provide "appropriate care," *id.* at 858, "to monitor the current status and needs of the children . . . within the parameters of [state] regulations and also to exercise adequate professional judgment in responding to the needs of these children," *id.* at 861. Thus, Judge Coffey described the controlling test as "solely whether state actors exercised appropriate professional judgment in each of their decisions, *id.* at 862, and the standard of "reasonable professional judgment" must be applied "to each decision regarding a foster child's care or placement," including "claims of improper placement decisions; . . . assertions of failure to professionally review, supervise or plan for the child; and . . . contentions of failure to provide necessary psychological care," *id.* at 863-64.

Clearly, Judge Coffey's delineation of the scope of the constitutional rights of foster children far exceeds that recognized by the Tenth Circuit, which relied on the majority opinion in *K.H. See Yvonne L. I*, 959 F.2d at 890-94. Additionally, as noted *supra*, the Supreme Court specifically cautions federal courts to limit their imposition of affirmative duties on a State only to those necessary in light of the identifiable liberty interest and the circumstances of the case. *Youngberg*, 457 U.S. at 319 n.25. Thus, to the extent Plaintiff attempts to assert rights similar to those propounded in the *K.H.* dissent and beyond those identified in *Yvonne L. I*, Defendants are entitled to qualified immunity.

The Court is also troubled by Plaintiff's persistent propensity to argue her case under a negligence standard. This is graphically illustrated in her concluding remarks to her response to Defendant Buchanan's Motion for Summary Judgment:

> A succinct summary of the worst of Buchanan's failure to exercise professional judgment appeared in Pecora's (Buchanan's expert) first report to the defendants:
>
> > Were supervisors *negligent* in not insisting on more forceful and timely actions? Yes, there were serious errors in judgement made . . . .

(Pl.'s Resp. Buchanan's Mot. Summ. J. at 22 (emphasis added).)

The Court does not question, nor do Defendants in many instances, that errors were made in this matter. As the Tenth Circuit has clearly stated, however, "'[f]ailure to exercise professional judgment' does not mean mere negligence." *Yvonne L. I*, 959 F.2d at 894; *see also County of Sacramento*, 118 S. Ct. at 1718 ("[T]he Constitution does not guarantee due care on the part of state officials; liability for negligently inflicted harm is categorically beneath the threshold of constitutional due process." (citing *Daniels v. Williams*, 474 U.S. 327, 328 (1986); *Davidson v. Cannon*, 474 U.S. 344, 348 (1986))).

**Were the Decision Makers Professionals?**

Plaintiff maintains that Defendants Pacheco, Gonzales, and Osborne were incompetent social workers and known by their supervisors to be so. (*See, e.g.*, Pl.'s Resp. Gonzales' Mot. Summ. J. at 1 n.1.) She also contends that the evidence shows that Defendants Grindell, Mullen, and Osborne were inexperienced in the duties to which they were assigned. (*See, e.g., id.* at 2 n.1.) Allegations of inexperience, a condition that all professionals must confront at some point in their careers, do not raise a real issue as to whether the social workers were "professionals." Allegations of incompetence,

if adequately supported, are another issue. Therefore, the Court will determine whether Defendants Pacheco, Gonzales, and Osborne are to be considered professional social workers.

Raul Gonzales

Plaintiff contends that Gonzales was incompetent because prior to May 1995 he received "deplorable evaluations with regard to his diligence[,] failure to complete his work, failure to do his job and general lack of attentiveness[; by his] own admission . . . he was unable to discharge his responsibilities in a timely manner[; and in 1996 he] was demoted from senior social worker to regular social worker." (*Id.* at 1.) The evidence does not support Plaintiff's conclusion regarding Gonzales's competence. His overall 1994 annual performance rating was "satisfactory or the equivalent"; in each criteria listed under "Social Worker Quality" he received a satisfactory or above average rating; and his total score of 222 put him well within the "Met Performance Criteria" range of 150-249. (Pl.'s Ex. 42 at 1120-24.) Sloppy record keeping skills and being late to work in 1994 and a demotion from senior social worker to regular social worker in 1996 do not in any way prove incompetence at those times or in 1995. Therefore, the Court finds that Gonzales was a competent social worker and will treat his decision making as that of a professional.

Effie Osborne

Plaintiff maintains that Defendant Osborne was unqualified to perform her supervisory duties in a placement unit and previously had failed to perform adequately in her position as supervisor of a treatment unit. Regarding the latter allegation, on her 1994 performance evaluation Osborne was rated as not meeting minimum criteria in the area of Human Resources Management and as below performance criterial in Community/Worker Relations, one of six areas included in Supervisor/Qualities and Skills. (*Id.* at 1718.) Apparently because of these deficiencies, her evaluator

advised Osborne "to consider stepping down from a supervisor position." (*Id.* at 1722.) Osborne's summary evaluation, however, was "Very Good" over all and she received a total score of 258.2, indicating that she exceeded performance criteria. (*Id.* at 1716, 1718.) Osborne officially contested the deficient areas of her evaluation and did not follow the proffered advice to leave supervising. (*Id.* at 1720-22.)

Plaintiff also claims that Osborne was unqualified to supervise in placement, the unit to which she transferred from treatment, because of her limited experience in licensing foster homes and training. It is uncontroverted, however, that Osborne had experience licensing foster homes earlier in her career, both when she was a generic caseworker and as a treatment social worker. (Pl.'s Ex. 32 at 46-47.) Plaintiff falls far short of showing that Defendant Osborne was not a competent supervisor, much less a professional social worker. The Court will treat Osborne's decision making as that of a professional.

Harry Pacheco

In her response to Defendant Buchanan's Motion for Summary Judgment, Plaintiff devotes two pages of argument to why Buchanan should be found constitutionally liable to M.W. for having retained and failed to supervise Harry Pacheco, whom Buchanan allegedly knew to be incompetent. (Pl.'s Resp. Buchanan's Mot. Summ. J. at 6-8.) Plaintiff, however, does not challenge Pacheco's status as a professional in her response to his motion for summary judgment. Rather, in two sentences included in an introductory paragraph to her factual background section, she recounts Pacheco's two-week suspension in 1991 for his relationship with a foster child to whom he was assigned as treatment social worker and whom he eventually adopted, and his reassignment to phone intake duty in 1994 during an investigation of his adopted son's previous foster father on charges of

abuse. (Pl.'s Resp. Pacheco's Mot. Summ. J. at 10.) Neither incident in any way shows Pacheco to have been professionally incompetent, at the times at issue here, or at any time. In fact, on his May 31, 1995, performance evaluation he received a summary score of 341, which put him at the high end of the "Exceeded Performance Criteria" category. (Pl.'s Ex. 42 at 2191.) The Court concludes that Defendant Pacheco was a professional social worker in mid-1995.

Thus, the Court finds that all of the Social Worker Defendants were professional decision maker, competent by education, training, and/or experience to make the particular decision at issue. As such, their decisions are presumptively valid.

**Were the Social Worker Defendants' Decisions a Substantial Departure from Professional Judgment, Practice, or Standards?**

Maureen Grindell

Defendant Grindell, a placement unit social worker, completed the home study leading to the licensing of Rachelle and Santiago Olivas as foster parents. Although Plaintiff observes that the Olivas study was the "first foster family licensure (homestudy) Grindell ever had done," (Pl.'s Resp. Grindell's Mot. Summ. J. at 1), Grindell was a state-licensed social worker with over twenty years experience, including eighteen years working in child welfare, (Social Worker Defs.' Consol. Statement Material Facts ¶ 175-76.) She had worked on adoption home studies for approximately seven years and for six years supervised social workers who did home studies for both adoption and foster families. (*Id.* ¶ 177-78.) Unquestionably, Defendant Grindell was a professional social worker and her decision making is presumptively valid.

Plaintiff charges that Grindell "committed multiple breaches of professional duty." (Pl.'s Resp. Grindell's Mot. Summ. J. at 1.) She first asserts that Grindell failed to perform a professionally

competent licensure study of the Olivases by not checking their criminal records, not obtaining the required number of references, accepting the Olivases as foster parents even though they had indicated that they did not want children with backgrounds and needs typical of most foster children, not recognizing the Olivases' financial instability, not adequately determining the Olivases' motivations for foster parenting, and not providing them with the support promised as a condition of their license.

Defendant Grindell did conduct the required criminal records check on the Olivases. While the state and federal reports came back negative, the local police check indicated that in 1992 Santiago Olivas was arrested for disorderly conduct. Grindell discussed this incident with Santiago Olivas, reported it in some detail in her home study report, and determined that no further inquiry was necessary. Santiago Olivas told Grindell that the arrest involved a disagreement with a traffic officer who thought two children in Olivas's car were required by law to be in the rear seat, wearing seat belts. Grindell also discussed and reported Rachelle Olivas's 1990 arrest and conviction for attempting to get a driver's license using a false birth certificate indicating she was of legal drinking age.

Grindell determined that neither incident disqualified either Olivas from being a foster parent. Santiago Olivas, however, apparently lied concerning the circumstances of his arrest, which actually was for harassing an ex-girlfriend. Grindell could have discovered this if she had ordered a copy of the police report. While this well may have been a mistake on Grindell's part, negligence in exercising professional judgment does not result in constitutional liability. Grindell did investigate the Olivases' criminal background. There were no felony convictions and no crimes against children or history of violence. She discussed the two arrest incidents in detail with the Olivases and made the judgment

that neither event required further investigation or disqualified the Olivases. Grindell's actions in this regard cannot be interpreted as being a substantial departure from professional judgment, much less a complete failure to exercise professional judgment.

The Court reaches the same conclusion regarding Plaintiff's other complaints about the home study. It is unclear exactly how many references were required, but Grindell did obtain references, past addresses, and job histories. Any deficiencies in this regard is evidence, at best, only of negligence on Grindell's part. That the Olivases may have indicated on a homework assignment during their foster parent training an unwillingness to accept children with characteristics typical to foster children is irrelevant. In any case, such a response apparently was not unusual in new applicants, and Grindell specifically discussed the characteristics of foster children with the Olivases. (Pl.'s Ex. 19 at 94-105). Similarly, Grindell did analyze the Olivases' finances, work schedules, and motivation to become foster parents. Recognizing the Olivases' limited experience with children, she also recommended that they be licensed for three children, and initially be given "easier children" or "hooked up with an experienced, seasoned foster parent in their community." (Defs.' Ex. 38 at 4021-22.) Although her home study of the Olivases may not have been perfect, the Court finds that she clearly applied professional judgment, practices, and standards in completing it.

Plaintiff also faults Grindell for placing M.W. and V.W. with the Olivases, on grounds that it was an overplacement and she did not match the children with the foster home. Although Plaintiff notes that records showing available foster homes on any particular date in May or June 1995 are now unavailable, (Pl.'s Resp. Defs.' Statement Undisputed Material Facts ¶ 98), it seems incontestable that there was a continuing shortage of foster home places and the situation was even more serious for special needs children. According to Peter Cubra, president of the board of directors

of Advocacy, Inc., the agency providing guardian ad litem services under contract to the Court

Administrator's Office and Plaintiff's contractor:

> My sense is that in 1995, more often than not there was not a bed readily available in a licensed foster home that was not an overplacement.
> . . . .
> . . . I didn't, myself, look at overplacements as a basis for seeking some kind of court order to move a child, nor do I recall having counseled people to do that, because on any given day, they just would be going from the frying pan to the fire. There was no place for them go.
> . . . .
> . . . My impression is that kids with disabilities, special medical needs, or who otherwise were eligible as special needs kids, had a more difficult time finding a placement that came anywhere close to meeting their needs than nondisabled kids.
> . . . .
> . . . Whether it was a special needs foster home, or a regular foster home, or just a safe place to sleep at night, it is hard to come by.

(Defs.' Ex. 29 at 8, 41-43.)

On May 16, 1995, it was Grindell's understanding that no family other than the Olivases was available to take both sisters. (Defs.' Ex. 1 at 149.) Department regulations permitted maximum license capacity to be exceeded to permit placements of sibling groups. (Defs.' Ex. 38 at 22150.) Taking into consideration the goal of keeping siblings together, her understanding that the Martinez children would be leaving the Olivas home in four to six weeks for reunification with their parents, and Atkins favorable report about the Olivases, Grindell called to see if the Olivases would accept M.W. and V.W. Grindell clearly exercised professional judgment in making this placement, even if she misinterpreted whether both children could be overplacements, or whether the first had to be within the license capacity. Furthermore, under these circumstances, she obviously cannot be criticized for failing to "match" the foster children with the foster home.

Plaintiff also claims that Grindell was under a continuing obligation to reassess the placement and certainly should have done so after referrals of abuse were made. Plaintiff's contention that an overplacement must be reassessed is unsupported by her citation to the record. (*See* Social Worker Defs.' Resp. Pl.'s Statement Facts ¶ 57.) Additionally, investigation of referrals clearly was the responsibility of the investigation unit, not Grindell. In any case, she did not ignore the home; she and other social workers consulted and monitored the situation and offered assistance to the Olivases. Also, the placement was reevaluated on July 19th, following the completion of the investigation into and unsubstantiation of the referrals.

Plaintiff next cites Grindell's failure to perform social work functions by withdrawing services during the investigation, alleging that she "did virtually nothing to alleviate the explosive situation in the home and failed to react to the Olivases' requests for help." (Pl.'s Resp. Grindell's Mot. Summ. J. at 16.) Plaintiff does not identify any services that Grindell allegedly should have provided, much less show an affirmative link between this alleged failure to act and M.W.'s injuries on July 23rd.

Finally, Plaintiff argues that Grindell is liable for failing to acquire or communicate information to other social workers during M.W.'s placement. Plaintiff contends, for example, that Grindell should have informed Atkins that she and Sandberg suspected M.W. might be the victim of Munchausen Syndrom by Proxy (MSBP). It is uncontroverted that no evidence shows that such a diagnosis would have been appropriate. Therefore, Plaintiff's contention is irrelevant and, furthermore, does not bear a casual relationship to the constitutional harm suffered by M.W. Plaintiff also maintains that Grindell should have essentially reviewed all of the facts and circumstances taken into consideration in licensing the Olivas home with Gonzales, Sandberg, and those attending the July 19th staffing, including the overplacement, that it was not a special needs home, the Olivases' criminal

history, and shared that the foster mother sounded stressed out and upset. Grindell had considered

the criminal history at the licensing stage and in her professional judgment deemed it not relevant.

As discussed *infra*, her supervisor, Effie Osborne, concurred. Osborne also attended the July 19th

staffing. Additionally, the participants at the staffing discussed and addressed issues such as special

needs certification for M.W. and the Olivases, the aggressiveness of the Martinez children, and

providing additional resources for the Olivas home. Steps were authorized to address those needs.

Relevant factors were considered and professional judgment was applied.

     The Court will grant Defendant Grindell's Motion for Summary Judgment and Qualified

Immunity.

## Effie Osborne

     Defendant Osborne, Maureen Grindell's supervisor, was in charge of a placement unit.

Plaintiff first assigns blame to Osborne for her failure "to exercise even minimal professional judgment

over Grindell's licensure and placement[4] decisions" and her abandonment of "her professional duty

. . . to pursue and correct deficiencies in the Olivas homestudy."[5] (Pl.'s Resp. Osborne's Mot. Summ.

J. at 2.) She also faults Osborne for being "aware that the matching of the Wilks children with the

Olivases was unsafe, yet allow[ing] the placement to continue even in light of dramatic changes in

circumstances which would have required a professionally engaged social worker to reassess them."

(*Id.*) Additionally, she claims Osborne is culpable for approving and ratifying Grindell's withdrawal

_____

   [4] The Court also notes that even if liability could attach for the decision to overplace M.W. and V.W. in the Olivas home, Defendant Osborne could not in any way be held culpable, as she was out sick that day and was not involved in the decision. (Pl.'s Ex. 32 at 101-102.)

   [5] The Court notes that Osborne did review the home study, as she was directly required to do due to her position as supervisor. While Rachelle Olivas's arrest did not concern her, Santiago Olivas's did, and she "discussed the incident, its implications, its ramifications" with Grindell, concluding that Grindell's "assessment was accurate and that there was no reason for the initial concern." (Defs.' Ex. 32 at 71-75.)

of services to the Olivas home. Clearly, as the Court has found that Maureen Grindell may not be held liable on these issues, neither may Defendant Osborne as her supervisor.

Plaintiff also argues that Osborne is liable for failing to investigate or communicate information regarding MSBP to the physicians. As discussed *supra* with regard to Defendant Grindell, this issue is a red herring, totally irrelevant to any possible finding of liability in this case. Plaintiff's contention that if others had known about the "evidence pointing to MSBP, the physicians then could have taken steps to make a diagnosis and request a psychological examination of Mrs. Olivas," (*id.* at 8 n.2), is without merit.

Plaintiff similarly charges that Osborne should have reported her suspicions that Mercedes had been sexually abused prior to her placement with the Olivases:

> Mercedes' condition was an enigma for us because while we were focusing a lot of time on bruising that you're suggesting was abuse, there were many other symptoms that the doctors were not diagnosing. And part of my experience was supervising a foster home in Rio Rancho that fostered the child that was the product of incest in a notorious case out in Magdalena. The child was like 10 months old. And [sic] the only way I can describe him by appearance is he appeared lifeless, like a wet rag. And [sic] I remember having discussions with the foster parent because she's the person who would take this child to the doctors, and I was assuming at the time that his condition was the result of his being the product of an incestuous relationship. His father was also his grandfather. And [sic] she said no, the doctors that [sic] said it was the incessant sexual abuse that rendered his appearance lifeless.
> So since we didn't seem to have a clear-cut diagnosis on anything, it seemed to me not unreasonable to explore that as a possible source of or one of the possible sources of Mercedes' condition.

(Pl.'s Ex. 32, pp. 230-31.) She based this possibility in part on the fact that Defendant Grindell had told her that "Mercedes had three elder siblings whose rights, I believe, were terminated and they were placed with relatives out of state for her mother's failure to protect them from ongoing sexual assaults by the man that Mercedes was living with until she came into our care." (*Id.* at 229.)

It is unclear whether Osborne reported her suspicions.[6] Obviously, if she did, Plaintiff's claim must fail. Even if she did not, however, the Court cannot find her failure to discuss this most speculative of theories as anything other than a reasonable exercise of professional judgment.

Plaintiff also asserts that Osborne failed to tell physicians and, later, the social workers attending the July 19th staffing, allegedly material information, such as that the Olivas home was licensed for only three children, that they were not licensed as special needs foster parents, that respite care was offered to Rachelle Olivas, and that both foster parents had prior criminal charges. Besides questioning the relevance of these allegedly material facts and whether they possibly could bear any casual relationship to M.W.'s injuries, the Court cannot attribute such failure, if that is what it was, to anything other than negligence, at most.

Plaintiff cites Defendant Osborne for concurring with the decision reached at the July 19th internal staffing to keep M.W. in the Olivas home. Critical to this determination, of course, was the conclusion reached the day before by Defendant Sandberg, who investigated the three abuse referrals, and her supervisor, Defendant Elam, that the referrals could not be substantiated, in other words, that they would be found "unsubstantiated." Working from that starting point, the social workers discussed various issues, including M.W.'s bruising, the lack of a medical explanation for the bruising, M.W.'s diagnosis of failure to thrive, the aggressiveness of the Martinez children, M.W.'s special

---

[6] Osborne testified at her deposition that she requested a Sexual Abuse Response Team (SART) exam at the July 17th medical staffing. (Pl.'s Ex. 32 at 228, 230.) Donna Teuteberg a Los Pasos social worker at University of New Mexico Hospital, who was responsible for initiating SART examinations and attended the meeting, declined to approve a SART in this instance. (*See id.* at 228 ("[Teuteberg] said that she wouldn't do a SART exam on Mercedes since Mercedes had not disclosed sexual abuse, even though Mercedes was living with the man who abused her own mother, her three eldest siblings, because Mercedes specifically had not disclosed.").) According to Osborne, Los Pasos already knew the information she related at the staffing. (*Id.* at 231.) Brenda Sandberg testified at her deposition that she did not recall Osborne saying at the medical staffing that she thought M.W. should have a SART examination. (Pl.'s Ex. 36 at 387-88.)

needs, the fact that MSBP had been considered and discarded, the unsubstantiation of the referrals, and that more medical tests results were expected. (Social Worker Defs.' Consol. Statement Material Facts ¶ 85(a).) The attendees also considered and balanced various available options, including removing M.W. from the home, the possible availability of M.W.'s great aunt for relative foster home care, certifying the Olivas home for special needs children and M.W. as a special needs child, and making a behavior management specialist available to assist in the home. (*Id.* ¶ 85(b).) The consensus of the social workers was that it was not in M.W.'s best interests to be moved, as she seemed to have bonded to the family, was progressing developmentally, and any move would be disruptive after only two months in custody. (*Id.* ¶ 85(c).) Finally, the social workers identified and authorized certain follow up steps, including beginning the process to certify M.W. as a special needs child and the Olivas home as a special needs home, providing increased resources to the Olivas home through Family Preservation Services, authorizing a behavior management specialist for the home, and pursuing the possibility of relative foster home placement with the great aunt.

That different information might have been considered, that this matter might have been handled differently or better, does not establish failure to exercise professional judgment. Osborne and the other social workers clearly considered the issues and balanced the alternatives. The Court cannot and will not second guess their decision making with the one hundred percent certainty of hindsight. Defendant Effie Osborne's Motion for Summary Judgment on Qualified Immunity will be granted.

Harry Pacheco

Defendant Pacheco was an after-hours emergency responder in the investigations unit headed by Defendant Susan Elam. His regular work hours were from 4:00 p.m. on Friday afternoon to 10:00

a.m. Monday morning. He took custody of M.W. and V.W. in the early morning hours of Monday, May 15, 1995, and placed them in separate temporary homes. On May 16th the children were placed in the Olivas home. Defendants Pacheco, Elam, and Rachelle and Santiago Olivas signed the Substitute Care Placement Agreement on that date.

There is some dispute as to how long Pacheco remained responsible for M.W. and V.W. and when Defendant Raul Gonzales took over as treatment worker. In any case, Pacheco would not have been involved with the children past the first week in June. The first child abuse referral on M.W., for unexplained bruising, was made on June 12 by a teacher at her day care facility.

Plaintiff asserts that Pacheco violated M.W.'s constitutional right to be reasonably safe from harm by failing to exercise professional judgment in placing her in the Olivas home. She complains he did not inform Mrs. Olivas of M.W.'s special needs; he did not remove the three Martinez children, who were already in the Olivas home, within 6 weeks of M.W.'s placement, as promised; he did not "match" M.W. to the foster home; and he did not consider the relevant factors in making an overplacement in the home. Plaintiff also finds fault in that the nine-day staffing was held prematurely, on May 17th; Defendant Pacheco did not provide treatment services to M.W.; and he failed to include in his records or tell others that Mrs. Olivas did not want a child with special medical needs, as M.W. arguably was, and that she wanted the three Martinez children removed from her home by the end of May.

Accepting Plaintiff's allegations as true, they neither rise to the level of establishing that Pacheco failed to exercise professional judgment with regard to M.W.'s safety, nor do they in any way show that he should have known or suspected that the Olivas placement presented a danger to her. It is not clear that Pacheco was involved in the decision to place the children with the Olivases,

and it is undisputed that at the time of the placement this was the only foster home available that allowed M.W. and V.W. to remain together as a sibling group. Furthermore, both Defendants Grindell, placement social worker, and Kalejta, county office manager in charge of the placement and treatment units, approved the overplacement with the Olivases. Finally, even if Pacheco's acts or omissions were abdications of professional judgment, they are too attenuated temporally and causatively from either the grievous injuries suffered by M.W. on July 23rd or the first referral on June 13th. Therefore, Defendant Harry Pacheco's Motion for Summary Judgment will be granted.

<u>James Atkins</u>

Defendant Atkins was the treatment worker for foster children Araceli, Ismael, and David Martinez, who were already placed with the Olivases when M.W. and V.W. arrived. Plaintiff alleges four categories of "breaches of professional judgment and duty," by Atkins: 1) failure to report child abuse and neglect committed by the Olivases against the Martinez children and M.W.; 2) failure to report material information and making misrepresentations to other social workers; 3) failure to disclose material facts to the Olivases regarding the Martinez children's special needs; and 4) failure to provide treatment services to the Martinez children and the foster parents. (Pl.'s Resp. Atkins' Mot. Summ J. at 3-14.)

Plaintiff asserts that Patricia Martinez, the Martinez children's step-grandmother complained to Atkins that Santiago Olivas sexually abused David during a transition stay at the Olivas home. Plaintiff additionally alleges Araceli, then ten years old, told Atkins that the Olivases hit and slapped David, made him take excessively hot showers, forced him to drink Mylanta, and pushed his head into a toilet full of urine and feces. Plaintiff further maintains that Araceli told Atkins that the Olivases

slapped, hit, and shook M.W.; brushed her teeth hard enough to inflict pain and force fed her hard food, following her dental surgery; and called her demeaning names.

There is no evidence that Atkins reported any of these instances to other social workers. There is no record of them in his case notes and he made no official referrals for abuse. In fact, Defendant Atkins denies that Mrs. Martinez or Araceli ever told him these things and he proffers innocent explanations for some of the alleged abusive acts. He also attempts to make Araceli's truthfulness an issue, noting that she did not report these events during her first interview following removal from the Olivas household, and through statements by her mother and psychologist that she often lied.

Issues of credibility are not appropriately determined on motion for summary judgment. Defendant's interpretation of events and Araceli's and her grandmother's credibility obviously are issues to be weighed and decided by the fact finder. Assuming that Atkins was aware of these allegations, they create a genuine issue of material fact as to whether he exercised professional judgment in this case; his failure to act on such accusations clearly could be found causally connected to the safety, or lack thereof, of any and all children in the Olivas home and to the ultimate harm suffered by M.W.

As to the other three areas of alleged breaches of duty, Plaintiff complains that Atkins failed to report certain other material information to his colleagues, such as the special needs of David and Ismael, the problems Rachelle Olivas reported to him regarding the children, that the Martinez children exhibited aggressive behavior toward the end of June, and that at some point Rachelle Olivas asked that some of the children be removed from her home. Plaintiff also faults Atkins for misrepresenting the Olivas foster home as "a dream placement," and for allegedly failing to disclose

the special needs of the Martinez children to the Olivases. Finally, Plaintiff cites Atkins for his alleged failure to provide treatment services, including making only one recorded visit to the Olivas home, failing to certify the Martinez children as special needs, not responding to the Olivases' stress by forcing them to accept respite services, and failing to attend staff meetings on the 17th and 19th of July.

These latter allegations do not amount to constitutional violations. For instance, whether special needs certification would have been appropriate for any of the children is by no means certain, but even if it had been, the Court cannot find that failure to pursue such treatment was so egregious a lapse that it would amount to an utter abdication of the application of professional judgment. Additionally, whether such certification would have prevented injury is speculative at best and the Court will not find that foster children in general and M.W. in particular have a constitutional right to such treatment. These claims are so far removed causally from the harm suffered by M.W. that they cannot form the basis of a constitutional claim against Atkins. Therefore, Defendant Atkins's Motion for Summary Judgment will be denied as to the charge of failure to report abuse and neglect and granted in all other respects.

<u>Raul Gonzales</u>

In early June 1995, Defendant Gonzales was assigned as M.W.'s treatment social worker. He previously had been her social worker when she was taken into state custody shortly after birth because she was born with drugs in her system. Gonzales also was involved in an earlier out-of-state placement of three older siblings of M.W. and V.W.

Plaintiff charges that Gonzales totally abdicated "not only . . . professional judgment, but also . . . professional duty." (Pl.'s Resp. Gonzales' Mot. Summ. J. at 2.) She faults him for allegedly

failing to provide treatment services for M.W., in violation of CYFD directives, not assessing her needs and obtaining court-ordered assessments, not monitoring M.W. and the Olivas home, and not certifying M.W. as special needs. Plaintiff contends these omissions proximately caused M.W.'s injuries because as a special needs child she allegedly would have been removed for the Olivas home and intensive management of her case would have deterred subsequent abuse.

As discussed *supra* with regard to Defendant Atkins, failure to provide particular services or treatment to M.W. cannot form the basis of a constitutional claim. Additionally, Gonzales did attempt to provide treatment services to M.W.'s natural mother and many services were provided to M.W. by other social workers and doctors in conjunction with the investigation. Furthermore, to the extent that there is a dispute as to when M.W.'s case was transferred from Pacheco to Gonzales, it has no material bearing on the issues before the Court. Any delay in no way caused the ultimate harm suffered by M.W.

Plaintiff alleges that Gonzales made numerous misrepresentations and failed to provide material information to other social workers. These allegations include telling Defendant Sandberg that Rachelle Olivas had gotten M.W. involved with programs and evaluations, informing the guardian ad litem that M.W. had scurvy, advising the Children's Court by letter on July 13, 1995, that relative foster parents were not available, failing to communicate to colleagues that M.W. previously had been designated special needs as a newborn, and not sharing the Wilks family's prior medical history and other historical information with Sandberg. Plaintiff also charges that Gonzales failed to report to those attending the July 19th staffing that the previous day Plaintiff Judy Bailey, the guardian ad litem, told the Children's Court that Rachelle Olivas had requested that both M.W. and V.W. be given a SART examination. Plaintiff contends that Gonzales also failed to report at the

July19 meeting that the guardian ad litem allegedly told him she wanted M.W. to be removed from the Olivas home. Plaintiff additionally claims that Gonzales failed to disclose three reportable incidents of abuse--his observations on June 13th that M.W. looked dazed, additional bruising that he allegedly saw on June 28th, and the guardian ad litem's report to him of the foster mother's request for a SART exam.

Besides being nothing more than possible evidence of negligence, Gonzales's alleged misrepresentations to the guardian ad litem and other social workers lack any affirmative link to M.W.'s injury and therefore cannot form the basis of a constitutional violation. Additionally, it is only pure speculation to contend that if the availability of M.W.'s great aunt, Norma Morgan, had been known, M.W. would have immediately been placed with her. Plaintiff's position that Gonzales violated M.W.'s rights by not reporting his observations on June 13th and 28th, respectively, that M.W. "seemed to be in a daze," (Pl.'s Ex. 42 at 4655), and that "bruising still remains unexplained," (*id.*), also is not well taken. Plaintiff's allegation that Gonzales observed bruising on the 28th is totally unsupported by the record. In any case, not reporting these alleged occurrences establishes neither failure to exercise professional judgment rising to the level of a constitutional violation nor bears any casual relationship to M.W.'s injury on July 23rd at the hands of Santiago Olivas.

The Court finds Gonzales's failure to report to those attending the July 19th internal staffing the information that the guardian ad litem told him at the adjudicatory hearing the day before, however, to be of a different nature. In his Motion for Summary Judgment, Gonzales addresses only the guardian ad litem's recommendation that M.W. and V.W. be removed from the Olivas home, not discussing at all Rachelle Olivas's request for SART exams. Accepting the guardian ad litem's assertions as true for purposes of his Motion, he argues that the girls' removal from the home was

discussed and rejected in any event, noting that at that time there was no suspicion of child abuse by the parents. This, however, begs the point. Gonzales did not tell the other social workers at this meeting of the guardian ad litem's position on this most important issue.

Furthermore, the foster mother's concern about possible sexual abuse and request for SART examinations also would have been of great relevance to the removal discussion and whether the participants should have suspected sexual abuse in the foster home. Bailey informed Gonzales and the Children's Court that Rachelle Olivas had requested a sexual abuse examination of the girls because she had observed M.W. engaging in sexual play with herself and V.W.'s genitals were enlarged. (Defs.' Ex. 21 at 7.) Gonzales made no referral of abuse based on this information: "I felt at that time we didn't want to traumatize the children anymore in providing another examination. I felt if the doctors had any concern, they would definitely notify us." (*Id.* at 123.) He also maintains that he did not consider this evidence of sexual abuse. None of the referrals and investigations to this point involved allegations of sexual abuse, and Gonzales knew this. (*Id.* at 123-24.)

Although whether this information should have been reported as a referral at this point is somewhat problematical, Gonzales apparently did not respond in any way to it, not even mentioning it at the July 19th staffing. Accepting these allegations as true, the Court finds that they create a material issue of fact whether Defendant Gonzales abdicated the duty to act professionally by not bringing them to the attention of the other social workers attending the internal staffing and, if so, whether this failure could be found causally related to the harm inflicted on M.W. by Santiago Olivas. Therefore, the Court will grant summary judgment to Defendant Gonzales only in part, denying it as to his failure to report at the July 19th staffing the information that the guardian ad litem allegedly told him on July 18th.

<u>Sharon Mullen</u>

Defendant Mullen, as head of the treatment unit, was the direct supervisor of Defendants Raul Gonzales and James Atkins, who were the treatment social workers assigned, respectively, to M.W. and the Martinez children. Mullen was on vacation from June 30 to July 25, 1995.

Although not directly calling Mullen's professional status into question, Plaintiff notes that Mullen became head of the treatment unit in December 1994, having had no previous supervisory experience. For the immediately preceding two years, however, Mullen had worked as a treatment worker in Albuquerque, and for the three years prior to that, as the sole social worker in Lovington, New Mexico, she also provided treatment services. Plaintiff also describes Mullen's 1995 evaluation as "negative." Although it does contain some critical comments and recommendations for improvement, it also includes areas of strength and in no way can be held to be an overall negative evaluation. As discussed *supra*, Defendant Mullen's decision making is treated as that of a professional social worker.

Plaintiff contends that Mullen bears supervisory liability for failing to supervise Raul Gonzales and approving and ratifying his withdrawal of treatment services, including special needs processing. As the Court will grant Defendant Gonzales summary judgment on these claims; Defendant Mullen may not be held liable as his supervisor.

Plaintiff also asserts that Mullen is subject to direct liability for her failure to report "new" bruising she observed on M.W. on June 13th[7] and for not responding to Defendants Grindell's and

_____

[7] Although in her response to Mullen's Motion for Summary Judgment, Plaintiff consistently states the date of this event as June 14, 1995, she gives a date of June 13, 1995, in her statement of material facts, (*see* Pl.'s Statement Material Facts ¶ 219). The Court believes the former date is correct, although whether it was the 13th or 14th would not have any material effect on this matter.

Osborne's memo of June 13 requesting M.W.'s family medical history. On June 13th Mullen saw M.W. in the CYFD office and observed bruises on her arm. The first referral for bruising was made by an employee at M.W.'s preschool the day before, June 12th. Plaintiff first maintains, without any supporting evidence whatsoever, that the bruises Mullen saw were different from those reported the previous day. (Pl.'s Resp. Mullen's Mot. Summ. J. at 15.) Further along in her argument, she faults Mullen for not determining whether the bruises were the same. (*Id.* at 16.) Regardless, applying professional judgment, Mullen determined that the bruises she saw were not indicative of abuse:

> They didn't look like an abuse bruise because they were perfectly shaped and they were translucent. And it really stuck out in my mind like you could almost look through it, kind of really transparent, but translucent, kind of a different color than a bruise would look. . . . and they were not in the usual places where you would see bruises from abuse. I picked this up immediately from looking at her. The bruises were in strange places. Instead of a wrist or a hand or some object hitting her, where it would land, it just did not look like any kind of a bruise that would happen from an abuse. It was very different places.

(Pl.'s Ex. 29 at 142.) As such, Mullen's alleged further failure to report her June 13th observation after the second referral for emotional abuse by Dr. Webster on June 19th, is likewise excusable. Additionally, even if either was a lapse in using professional judgment, neither could be held to have proximately caused the grave injury suffered by M.W. on July 23rd; multiple investigations were underway into reported physical and emotional abuse of M.W.

Finally, any failure to provide family medical records to the investigative team was, at worst, negligent. More importantly, any failure in this regard is in no way affirmatively linked to M.W.'s injury on July 23rd. Therefore, Defendant Mullen's Motion will be granted.

Brenda Sandberg

Defendant Sandberg was responsible for the investigation of the three referrals made concerning M.W. As is true throughout this case, in her attempt to show lack of professional judgment, Plaintiff submits a litany of alleged errors made by Sandberg during the course of her investigation. As all Defendants maintain, Plaintiff uses a magnifying glass to analyze each and every act and omission made by Defendants from May to July 23rd, with the obvious benefit of 20/20 hindsight.

Plaintiff's compilation of allegations against Defendant Sandberg include: failure to acquire essential information, such as the Olivases licensure/placement file, M.W.'s and V.W.'s intake/investigative files, and the Martinez children's files; failure to recognize as neglect the Olivases' failure to assist M.W. in various activities, such as getting out of the tub; failure to communicate with other social workers about possible MSBP, lies allegedly told by Rachelle Olivas, and the Olivases' failure to assist M.W.; failure to deliver treatment services during the investigation, to hold a staffing within one week of each referral, pursuant to the Barnas directive, and to notify the guardian ad litem of each referral; failure to provide information to University of New Mexico Hospital (UNMH) doctors at the July 17, 1995, medical staffing about Rachelle Olivas's lies concerning antibiotics/strep throat and taking M.W. to the doctor between June 23rd and July 12th, the Olivases' unwillingness to touch M.W., overplacement in the Olivas home, information about the Olivases' background, information about the investigation, the conflict between Dr. Webster's version of the pharmacy incident (Rachelle Olivas's slamming fist into her hand and threatening to sell M.W. to gypsies) and Rachelle Olivas's explanation, and the existence of three referrals; failure to investigate MSBP; unsubstantiating the first referral; failing to accept the physicians' diagnosis; treating the three

-31-

referrals as one investigation; failing to use professional judgment in conducting the investigation; failing to report Defendant Osborne's concerns regarding possible sexual abuse of M.W. while in her natural mother's home and to conduct a SART examination; withholding information from the social workers at the July 18th and 19th staffings about Rachelle Olivas's lies concerning antibiotics/strep throat and taking M.W. to a few doctors between June 23rd and July 12th about the July bruising, the possibility of MSBP, M.W.'s and her family's medical history, the Olivases' criminal history, the number of children limitation on the Olivases' foster care license and their unwillingness to care for a drug baby, the Olivases unwillingness to touch M.W., M.W.'s special needs status, and erroneous unsubstantiation of first referral and failure to reinvestigate; and failure to report other abuse/neglect, such as failure to thrive, failure of Olivases to assist M.W., and Osborne's supposition of possible sexual abuse.

In the face of these myriad accusations, it is perhaps most helpful to look at what Defendant Sandberg did do during the course of her investigation. (*See* Defs.' Ex. 38 at 4214-57.) On June 12th, the day she was assigned the first referral for bruising reported by M.W.'s preschool, Sandberg spoke with social workers Grindell, Atkins, and Gonzales to obtain background information; she had a telephone conversation with the referral source concerning the referral; she spoke by phone with Dr. Aoki at UNMH about possible diagnoses for the bruising; and she observed M.W. at the CYFD office and had a conversation with the Olivases about M.W. and the other foster children in their home. On June 13th, Sandberg sent a request to UNMH for all of M.W.'s medical records. She also spoke with Defendant Atkins about the Olivases and the Martinez children. Sandberg and her supervisor, Defendant Susan Elam, held a formal staffing on June 14th, at which Elam gave Sandberg instructions on further interviews, records, and contacts to be pursued. On June 15th Sandberg

received Dr. Cito's dental records concerning the extensive dental surgery he performed on M.W. on May 24th.

On June 20th, Sandberg was assigned the investigation into Dr. Webster's June 19th referral of emotional abuse. She spoke with Defendant Grindell about conversations with Rachelle Olivas the previous day and called Rachelle Olivas herself to discuss a home visit and the foster children's health. After a staffing with Elam to discuss Dr. Webster's referral and the home visit, Sandberg telephoned Dr. Webster to discuss the results of M.W.'s blood testing and Dr. Webster's observations the previous day causing her to make the referral. Sandberg also spoke to Grindell about respite for the Olivases and the various diagnoses mentioned by Rachelle Olivas. Later, Sandberg visited the Olivas home. The Olivases, M.W., V.W., and the Martinez children were present for part or all of her visit. Sandberg observed M.W.'s bruises, discussed the events of the past several days, and observed the condition of the house and the interaction between the children and the Olivases.

On July 21st, Sandberg called Kathy Kunkel, a social worker at UNMH, and requested her assistance with a medical diagnosis. She also had a conversation with Defendant Atkins about the Olivases. The next day Sandberg visited Araceli Martinez at her day care facility and interviewed her about activity in the Olivas home. She also attempted to talk to Ismael, but he would not cooperate.

On June 23rd, Sandberg had a telephone conversation with Donna Teuteberg of Los Pasos/UNMH about previous contact with M.W. and follow up medical care. She also spoke with Grindell and Atkins about the situation in the Olivas home. During a visit to the daycare facility she interviewed M.W.'s teacher and the director about their observations of M.W. and the Olivases and spoke to M.W. Sandberg also had another telephone conversation with Kunkel about Dr. Webster's

referral, spoke to Dr. Aoki about the results of blood tests, and requested from both a written report about the blood tests.

Between the last week of June and July 12th, Sandberg concentrated on a different investigation assigned to her by a superior with instructions that it be conducted immediately. Following completion of that work, on July 12th Sandberg had a telephone conversation with Rachelle Olivas about new bruises on M.W., causing Sandberg, herself, to make the third referral on M.W. The next day Sandberg had a staffing with Elam and prepared that referral. She also telephoned Kunkel about doctor visits and scheduled an appointment for M.W. that day. Sandberg attended the examination by Dr. Webster, who concluded that the bruises were most likely normal toddler bruising, and spoke with Kunkel and Webster about the findings. Sandberg also requested that Kunkel schedule a meeting with UNMH doctors and CYFD staff to discuss the medical issues, and had a telephone conversation with Teuteberg about a home visit.

On July 17th Sandberg attended the medical staffing with Grindell, Osborne, Kunkel, Teuteberg, Shauna McCosh, and Drs. Gribble and Cordova. She also had a phone conversation with Emily Olivas, Rachelle Olivas's mother-in-law, about the events Dr. Webster observed in the UNMH pharmacy on June 19th and which had caused Webster to make the second referral. On July 18th, Sandberg spoke by phone with Kunkel about additional medical information and plans for additional assistance with M.W. in the Olivas home. Sandberg also held a formal staffing with Elam about the final decision on the referrals and recommendations. Finally, on July 19th, an internal staffing attended by Defendants Kalejta, Buchanan, Elam, Osborne, Sandberg, Grindell, and Gonzales was held to report on the investigation, and discuss plans for further assistance in the foster home.

Clearly, there is no constitutional requirement that an investigation of this nature be conducted in the manner propounded by Plaintiff. In fact, there is no constitutional right that an investigation be conducted in any particular manner at all--or if there is, it has yet to be clearly established in the law in the Tenth Circuit. The same is true regarding the provision of treatment services; M.W. had no constitutional right to any particular treatment services at any specific time. Also, violation of state laws or regulations does not necessarily amount to a constitutional violation, and Plaintiff has not shown such to be the case here. The only issue, then, is whether Defendant Sandberg exercised professional judgment in her investigation.

As a professional social worker, Defendant Sandberg's decision making in investigating the referrals of abuse of M.W. is presumptively valid. While Plaintiff certainly has indicated what she feels would have been a better investigation, the Court will not second guess Sandberg's actions. The fact that Sandberg might have done things differently, done more, or come to different conclusions, does not establish liability. Obviously the benefit of hindsight makes circumstances much clearer to all involved, but the Court cannot find that Sandberg's conduct of the investigation and the conclusions she drew therefrom were such a substantial departure from accepted professional judgment, practice, or standards to amount to an abdication of the application of professional judgment.

Thus, addressing Sandberg's conduct as a whole, the evidence does not show that she failed to exercise professional judgment. Additionally, many of the alleged deficiencies, even if they were abdications of professional judgment, are immaterial--they are not causally related to the harm inflicted upon M.W. by Santiago Olivas on July 23, 1995. Finally, budgetary constraints resulting in staff vacancies and large caseloads, clearly impacted Sandberg's investigation. In 1995 Sandberg

carried between twenty-five and thirty open cases, receiving between ten and twelve new assignments each month. (Social Worker Defs.' Consol. Statement Material Facts ¶ 187 (uncontroverted by Plaintiff; *see* Pl.'s Resp. Defs.' Statement Undisputed Material Facts ¶ 187).) This necessarily required her to prioritize her activities on a daily basis, and actually to defer the M.W. investigation in late June when her supervisors assigned her a higher priority case. (Social worker Defs.' Consol. Statement Material Facts ¶ 193 (uncontroverted by Plaintiff; *see* Pl.'s Resp. Defs.' Statement Undisputed Material Facts ¶ 193).) For all of these reasons, then, Defendant Sandberg's Motion for Summary Judgment will be granted.

<u>Susan Elam</u>

Defendant Elam supervised an investigations unit and assigned the three referrals concerning M.W. to Defendant Brenda Sandberg. Elam also was Harry Pacheco's supervisor.

Plaintiff contends that Elam is liable because she directly participated in the allegedly early unsubstantiation of the first referral, the later decision to unsubstantiate all referrals, the July 19th decision to leave M.W. in the Olivas home, and the designation of Dr. Webster's June 19th referral of emotional abuse as Priority I, rather than emergency status. Plaintiff also claims that Elam failed to note Sandberg's "obvious investigative failures and the numerous 'red flags' raised during the investigation and turned a blind eye to Sandberg's abandonment of professional judgment in the conduct of the investigation." (Pl.'s Resp. Elam's Mot. Summ. J. at 5.) As the Court has granted summary judgment to Defendants Pacheco and Sandberg, Elam cannot be found liable in her supervisory capacity.

While Plaintiff argues that Elam lacked a basic understanding of social work, she does not directly challenge Elam's position as a professional. The Court finds that Elam was a professional social worker and that her decision making therefore is presumptively valid.

The Court finds it most questionable that the first referral on M.W. was unsubstantiated earlier than July 18, 1995. (*See, e.g.*, Pl.'s Statement Material Facts ¶ 331 ("On July 18, 1995 Elam and Sandberg unsubstantiated all three referrals in a staffing with Buchanan . . . ."); Pl.'s Ex. 1 (Plaintiff's expert Gillmer's report) at 44 (referral of 6/12/95 "determined not substantiated 7/19/95").) Even if it was, however, the investigation regarding M.W. clearly continued and Elam could no more be found liable for making that decision than she can be for participating in the decision to not substantiate any of the other referrals. As discussed with regard to Defendant Sandberg, the Court will not second-guess these professionals after the fact. That they might have conducted a different, even better, investigation or reached different or better conclusions is beside the point. Their conduct in this matter does not evidence failure to employ professional judgment. Therefore, the Court will grant Defendant Elam's Motion for Summary Judgment.

John Kalejta

As county office manager, Defendant Kalejta supervised Effie Osborne, a placement unit supervisor, and Sharon Mullen, a treatment unit supervisor. Osborne, in turn, was in charge of Maureen Grindell and Mullen supervised Raul Gonzales and James Atkins.

Plaintiff maintains that Kalejta did not exercise professional judgment in approving the withdrawal of services by Gonzales and Mullen, thereby failing to provide treatment services or certify M.W. as special needs; failing to supervise Gonzales while Mullen was on vacation from June 30 through July 26; failing to certify M.W. as special needs; allowing the overplacement of children

in the Olivas home; approving the licensure of the Olivas home; and making the decisions reached at the July 19, 1995, staffing. Defendant Kalejta argues that as a *manager*, as opposed to a *supervisor*, a different standard applies to his conduct. While this position may hold some appeal, he cites no authority so holding and the Court declines this opportunity to trail blaze new paths in the law.

In any case, as a supervisor, Defendant Kalejta cannot be found liable if his subordinates have not violated Plaintiff's constitutional rights. The Court has determined that the only Defendants serving under Kalejta who are not be entitled to summary judgment are Gonzales and Atkins. Gonzales failed to report at the July 19th staffing that the guardian ad litem allegedly had told him she wanted the children removed from the Olivas home and that Rachelle Olivas wanted M.W. and V.W. to have SART exams. Atkins failed to report instances of abuse allegedly related to him by Patricia Martinez and Araceli. Surely there is no way Kalejta possibly could have known of the alleged failures by these subordinates to report material information and he cannot be held liable, even if they may.

As previously discussed, foster children are not constitutionally entitled to any particular treatment services, to certification as special needs, or not to be over placed in a home. Kalejta's policy to have the treatment social worker step back during an investigation is a discretionary decision that in no way indicates a failure to exercise professional judgment. Treatment services were provided to M.W., including extensive dental treatment in May and numerous medical examinations throughout the period. Strikingly, not one medical doctor who examined M.W. between mid-May and July 23rd diagnosed physical abuse, even though many of the appointments were for the unexplained bruising. Additional services were authorized on July 19, including initiation of special needs certification. M.W. clearly had multiple contacts with social workers, doctors, and other

professionals throughout the investigatory period. While the question of liability certainly might be different if M.W. truly had been abandoned during the investigation, with no contact with social workers or other interested professionals, such was not the case here.

Plaintiff's contentions concerning Kalejta's responsibility to supervise Gonzales while Mullen was on vacation is almost absurd. Obviously Kalejta could not and should not have taken on all of Mullen's duties, to the detriment of his own, while Mullen was out of the office. The same goes for the extreme level of supervision and oversight Plaintiff contends was necessary regarding the licensing and other decisions made by the social workers. There has been no showing that Kalejta abdicated professional judgment in relying on other social workers to professionally carry out their assigned duties.

Financial constraints also played a part in M.W.'s case. It is indisputable that in 1995 there were not sufficient homes for foster children and Plaintiff has not seriously contested that the Olivas home was the only available placement for M.W. and V.W. on May 16th. Once the sisters were placed with the Olivases, criteria such as maintaining stability and encouraging visits with their mother led to the decision to continue the initial placement. In any case, as all Defendants have asserted, negligence alone, even a series of negligent acts, is not sufficient to state a claim under § 1983. Therefore, the Court will grant summary judgment to Defendant Kalejta.

Nora Buchanan

As county office manager in charge of four investigation units and two family preservation units, Defendant Buchanan supervised Susan Elam, who in turn supervised Brenda Sandberg and Harry Pacheco. As discussed *supra* with respect to Defendant Pacheco, Plaintiff contends that Buchanan should be found constitutionally liable to M.W. for having retained and failed to supervise

Pacheco, allegedly an unfit employee. As the Court has found that Pacheco was a professional social worker, Plaintiff's argument against Defendant Buchanan too must fail. Plaintiff's contention that Buchanan failed to understand or appreciate fundamental concepts of child welfare likewise lacks merit. Buchanan's decision making will be treated as that of a professional social worker, presumptively valid. As was the case with Defendant Kalejta, however, Buchanan's attempt to distinguish managerial from supervisory liability is not well taken.

Plaintiff's claims against Buchanan include failure to treat the three referrals separately, rather than as one investigation; failure to reinvestigate the first referral after a blood disorder was ruled out by the doctors; failure to tell Sandberg to provide treatment services; failure to secure an independent medical evaluation; failure to recognize evidence of child abuse; failure to disclose material information; unsubstantiation of all the referrals; and failure to supervise and correct deficiencies in the investigation.

As was the case with Defendant Kalejta, Plaintiff argues an unrealistic level of supervisory oversight that certainly cannot be constitutionally required. Regardless, Plaintiff has not established that Defendants Elam, Sandberg, or Pacheco violated M.W. constitutional rights. Likewise, she has in no way shown that Buchanan failed in any way to exercise professional judgment, certainly not so as to have caused M.W.'s injuries. The Court will grant Buchanan's Motion for Summary Judgment.


Barring the exceptions described with regard to Defendants Atkins and Gonzales, the Court finds that the Social Worker Defendants are entitled to summary judgment on grounds of qualified immunity. As professionals, their decisions are presumptively valid and Plaintiff has not met her burden to show otherwise; nor has she established the causal connection necessary to any finding of

liability. Simply put, Defendants have not violated a clearly established statutory or constitutional right of which a reasonable person would have known.

This, of course, is not in any way meant to downplay or justify the grievous harm suffered by M.W. As the Court observed in *White v. Chambliss*:

> We are reminded again that the defense of qualified immunity is often asserted in the most difficult of cases. Yet it is precisely for the hard case that the immunity exits. The availability of immunity cannot be judged solely by tragedies that later occur or by mistakes that later come to light. Knowing what we know now, no child would have been placed in the care of the Bonners. But now is not then, and few mortals stand unscathed by hindsight. The question under qualified immunity is thus whether fallible and imprescient human beings acted reasonably on the law as it stood and on the facts as they were known at the time the action was taken. On this record, we are unable to find that the standard of objective reasonableness applied to the actions of public officials has been transgressed.

112 F.3d 731, 739 (4th Cir. 1997)(internal citation omitted).


**IT IS HEREBY ORDERED** that Defendant John Kalejta's Motion for Summary Judgment (Docket No. 379), filed July 2, 1999; Defendant Harry Pacheco's Motion for Summary Judgment (Docket No. 382), filed July 2, 1999; Defendant Nora Buchanan's Motion for Summary Judgment (Docket No. 388), filed July 2, 1999; Defendant Elam's Motion for Summary Judgment (Docket No. 395), filed July 6, 1999; Defendant Sandberg's Motion for Summary Judgment (Docket No. 399), filed July 6, 1999; Defendant Sharon Mullen's Motion for Summary Judgment and Qualified Immunity (Docket No. 408), filed July 6, 1999; Defendant Effie Osborne's Motion for Summary Judgment on Qualified Immunity (Docket No. 412), filed July 6, 1999; and Defendant Maureen Grindell's Motion for Summary Judgment and Qualified Immunity (Docket No. 416), filed July 6, 1999 **GRANTED**.

**IT IS FURTHER ORDERED** that Defendants John Kalejta, Harry Pacheco, Nora Buchanan, Susan Elam, Brenda Sandberg, Sharon Mullen, Effie Osborne, and Maureen Grindell are **DISMISSED** from this action.

**IT IS FURTHER ORDERED** that Defendant Jim Atkins' Motion for Summary Judgment (Docket No. 385), filed July 2, 1999, and Defendant Raul Gonzales' Motion for Summary Judgment and Qualified Immunity (Docket No. 404), filed July 6, 1999, are **GRANTED IN PART** and **DENIED IN PART**.

**IT IS FURTHER ORDERED** that Defendants' Request for Oral Argument on Motions for Summary Judgment (Docket No. 426), filed July 6, 1999, is **DENIED AS MOOT**.

**IT IS FURTHER ORDERED** that Defendant Buchanan's Motion in Limine (Docket No. 474), filed October 28, 1999; Defendant Kalejta's Motion in Limine (Docket No. 478), filed October 28, 1999; Defendant Harry Pacheco's Motion in Limine (Docket No. 482), filed October 28, 1999; and Defendants Sandberg's and Elam's Motion in Limine (Docket No. 494), filed October 28, 1999, are **DENIED AS MOOT**.

_____
**UNITED STATES DISTRICT JUDGE**